**KOBE, Inc. et al. v. DEMPSEY PUMP CO. et al.**

**DEMPSEY PUMP CO. et al. v. KOBE, Inc. et al.**

Nos. 4313, 4314.

United States Court of Appeals
Tenth Circuit.

July 5, 1952.

Writ of Certiorari Denied Oct. 13, 1952.
See 73 S.Ct. 46.

Rufus S. Day, Jr., Cleveland, Ohio, Ford W. Harris, Jr., Los Angeles, Cal., and William A. McAfee, Cleveland, Ohio, (McAfee, Grossman, Taplin, Hanning,

418

Newcomer & Hazlett, Cleveland, Ohio, Harris, Kiech, Foster & Harris, Los Angeles, Cal., Fairfield & Woods, James A. Woods, and Charles J. Beise, Denver, Colo., on the brief), for appellants.

R. B. McDermott and Charles M. McKnight, Tulsa, Okl. (Robert F. Davis, Washington, D. C., Bradford J. Williams, Fenelon Boesche and T. Hillas Eskridge, Tulsa, Okl., on the brief), for appellees, Dempsey Pump Co. and Oscar E. Dempsey.

Anne Moroney, Tulsa, Okl., for Specialty Sales and Service, Inc.

Before PHILLIPS, Chief Judge, and MURRAH and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

Kobe, Inc.,[1] and Alta Vista Hydraulic Company, Ltd., California corporations, sued Dempsey Pump Company, an Oklahoma corporation, Oscar E. Dempsey, its president, Specialty Sales and Service, Inc.,[2] an Oklahoma corporation, and M. L. Walraven, Jr., for infringement of five patents. The amended complaint also alleged that the defendants, which included a former employee of Kobe, Inc., conspired to use information of Kobe obtained from former employees for unfair competition and unfair business practices. The defendants denied the validity of the patents or that they were infringed if valid. The unfair business practices were denied. As a further defense and by cross-complaint, the defendants alleged abuse of the patent monopoly in violation of Secs. 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C.A., §§ 1 and 2, and counterclaimed for triple damages under Sec. 4 of the Clayton Act, 15 U.S.C.A. § 15.

The trial court held that the plaintiff was the owner of patents numbered 1907951, 2081220, 2473864 and 2081223, and that it was a licensee under patent 1907947, all relating to hydraulic pumps. It held patent 1907947 valid and infringed in each claim in suit. Three of the other patents were held to be invalid but infringed if valid. The fifth patent, number 2473864, was held to be invalid but infringed if valid. The cause of action relating to the unfair business practices was dismissed. The court held the plaintiffs guilty of unlawful monopolization under the Sherman Act and awarded triple damages.

On the counterclaim the court found that Dempsey had suffered losses as a result of the unlawful monopoly in the sum of $143,364.50. It included expenses and attorney fees in connection with the defense of the infringement action totaling $23,045. It found that Specialty had suffered a loss of commissions on the sale of pumps and auxiliary equipment in the sum of $23,481.41. It also allowed Dempsey $25,000 attorney fees incurred in the prosecution of the counterclaims and $5,000 attorney fees to Specialty. Under the Clayton Act judgment was entered in favor of Dempsey for $430,093.50 and for Specialty in the amount of $70,444.23, and the plaintiffs were enjoined from continuing the monopoly.

On appeal the basic contentions of the plaintiffs for reversal are that the court erred in holding that the plaintiffs or their predecessor was guilty of monopolizing a part of trade or commerce for the reasons that: (1) the evidence did not show that the plaintiffs or their predecessor had any power to monopolize the field of the hydraulic pump for oil wells; (2) that there was no evidence of any purpose or intent on the part of the plaintiffs or their predecessor to monopolize that field; and (3) that even if the plaintiffs' predecessor, herein referred to as Old Kobe, had been guilty of unlawful monopoly there was no evidence that the plaintiffs were guilty of such monopoly for the reasons: (a) that Kobe or its parent company, Dresser Industries, Inc., was not responsible for a monopoly of the predecessor in the absence of proof that Kobe was guilty of continuing the monopoly; (b) that the patents acquired by Kobe in the reorganization did not give it power to monopolize the field

---

1. Kobe, Inc., will be referred to herein as Kobe or plaintiff.

2. Dempsey Pump Co. will be referred to herein as Dempsey; Specialty Sales and Service, Inc., as Specialty, or both as defendants.

of hydraulic pumps; (c) that there is no evidence that Dresser or Kobe had any purpose or intent to monopolize that field; and (d) that Kobe was not guilty of such monopoly even though it had the power and the purpose to monopolize the hydraulic pump field because it had never refused to grant licenses on a reasonable basis and had not otherwise misused its patents. It is also contended that the·record does not warrant the findings of damages in favor of the cross-claims even if the plaintiffs were guilty of monopolization. The correctness of the court's finding as to two of the patents is also questioned by the appeal and the cross-appeal.

To determine the antitrust issues, it is necessary to explore the background and history of the development of the hydraulic pump for oil wells and the business conduct of Old Kobe leading up to the creation of and the business conduct of Kobe.

Clarence J. Coberly, an engineer, inventor and industrialist, organized Old Kobe in 1923 and was its president throughout its existence. In 1925 there was no hydraulic pump available to the oil industry for pumping oil from wells, and Coberly recognized the need for such a pump and its commercial opportunities. Due to the increasing depth of oil wells and the unevenness of wells caused by rotary drilling, the need for improved methods for lifting oil from wells was generally recognized. Inventors Crum, Scott, Humphreys and Gage, separately and independently of each other, conducted experiments and obtained patents relating to hydraulic pumps. It was during this time that Gage built and sold the first pump of this kind. At this point Crum, Scott and Humphreys were attempting to manufacture and market a pump under their patents but the ventures did not meet with financial success. These patents were then conveyed to Scott-Ross & Company which continued experiments under the direction of Scott. In order to separate the hydraulic pump enterprise from the other business of Scott-Ross, the Rodless Pump Company was organized in 1929. Up to 1932 Rodless had manufactured and sold a small number of pumps. It had also acquired patents issued to Yungling and Knox. In 1932 Rodless was in financial difficulties but it was the holder of important patents for the production and marketing of hydraulic pumps.

The Gage pump, during this time, was showing signs of success. The Alta Vista Hydraulic Company, Ltd., was created and certain of the Gage patents were assigned to it, among which was patent 1907947, one of the patents in suit. By 1932 Gage and Alta Vista had advanced in the actual manufacture of hydraulic pumps to such an extent that they had entered the Mid-Continent Field of oil production through a licensee. Also during this time, Coberly, through Old Kobe was ready to market a hydraulic pump. He was satisfied that his design infringed the Humphreys patents and possibly others, but was unable to secure a license from Humphreys and consequently did not press his experiments at this time but was granted several valuable patents. In 1929 Coberly learned that Rodless had secured a license under the Humphreys and Crum patents. He approached Rodless and proposed that Rodless and Old Kobe consolidate their patents for the use of both. This resulted in the First Rodless-Kobe Agreement of March 1, 1933. This agreement provided that a corporation should be created for the purpose of holding title to the patents assigned to a pool. The new corporation was called Roko Corporation. It had no function other than the holding of the pool patents, granting licenses according to the terms of the agreement, and the acquiring of other patents relating to hydraulic pumps. Kobe and Rodless were to assign to Roko all of their patents and all future inventions or patents acquired for the 25 year period provided for in the agreement. The pool provided for was not an open pool. It was to issue only a license to Old Kobe, but Rodless was to have the right to a similar license if it should elect to claim that right within three years from the date of the agreement. This right was never exercised and was cancelled out by agreement within about one year. It was specifically agreed that Roko should not issue any license to other persons except upon unanimous vote of the Board of Directors, three

of whom were nominated by Old Kobe and three by Rodless. The agreement provided that Roko should establish a schedule of prices and terms of sale which was to be controlling of all sales by its licensees and included a form of license agreement requiring the licensee to comply with the prices fixed by the patent pool. The price fixing provision was eliminated in a subsequent amendatory contract after Rodless had surrendered its option to be licensed, and Old Kobe was then the sole licensee of the pool and was able to control its own prices.

The agreement provided that the purpose of the pool was to acquire patents relating to hydraulic pumps and to do everything reasonably within its power to "build up and maintain its patent monopoly." At the time of the execution of this agreement, the desirability of acquiring the Gage patents for the pool was recognized. This was accomplished on April 19, 1934, when Roko executed two agreements whereby it acquired the patent rights of Gage and Alta Vista. Seven patents were purchased from Gage as an individual for $12,000 in cash. In this agreement Gage agreed that he would not engage in any business or accept any employment in any way detrimental to Roko or its licensees for a period of five years. It also required Gage to assign to Roko any inventions or patents relating to hydraulic pumps which he might acquire within a period of 10 years. The Alta Vista arrangement was not for an outright assignment of its patents, but was an exclusive license probably because of an outstanding limited license. This contract provided that if Alta Vista should acquire any patents in the future relating to hydraulic pumps, it would grant exclusive rights to Roko and its licensees. It did not require that the Gage pump be manufactured or placed upon the market, instead the royalties exacted were a percentage of the proceeds of the sale of all pumps manufactured by licensees of Roko. No pumps were ever manufactured or marketed under any of these patents. The first Alta Vista agreement did not prohibit Alta Vista from producing pumps under the license, but Alta Vista abandoned the business and in

a later agreement declared that the earlier license to Roko was intended to be exclusive. After November 9, 1934, when by amendment to the original agreement Rodless surrendered its right to obtain a license from Roko, Old Kobe became the sole licensee and manufacturer of hydraulic pumps under the Roko pool, and was free from any threat of competition or patent infringement from any known source after the acquisition of the Gage and Alta Vista patents.

Subsequently, patent counsel for Old Kobe and Roko continuously checked patents which were issued from the patent office and which might affect their business. During the period between 1933 and 1945, Old Kobe and Roko acquired a total of more than 70 patents from inventors in and out of their own organization. During this time Old Kobe, under the direction of Coberly, produced only the Coberly pump and had a thriving business throughout most areas where oil was produced. The first real manufacturing and selling efforts of Old Kobe were commenced only after all patents from which competition might develop were in the Roko pool and after Old Kobe became the sole licensee from Roko. Its business prospered and no other hydraulic pump in the field was offered to the industry until the Dempsey pump appeared in 1948, at which time annual sales of Old Kobe exceeded $4,000,000.

In 1944 Dresser Industries, Inc., became interested in the manufacture of hydraulic pumps for oil wells. Dresser is a holding company for corporations manufacturing heavy oil field equipment. It desired to include the business of Old Kobe. A plan was agreed upon whereby all the assets of Old Kobe were to be transferred to Dresser, which was to assume all of Old Kobe's liabilities, and issue Dresser stock for distribution to Old Kobe stockholders in exchange for the surrender of their stock. Old Kobe owned only one-half of the stock in Roko, and the reorganization agreement was dependent upon Dresser being able to acquire the other one-half of Roko stock which was owned by Rodless. This was also accomplished by stock trans-

fer. Dresser then transferred to Kobe, a new California corporation of the same name as Old Kobe, all the assets, including 72 patents, which it had acquired in the transaction. All of the stock of the new corporation was owned by Dresser. There was no interruption of or change in the business. The manufacture and marketing of hydraulic pumps continued as before the reorganization with the same personnel and under the same corporate and trade name. Coberly remained in charge of the Kobe enterprise as president of the new corporation, but the directors were nominated from officials of Dresser.

In 1947 Oscar Dempsey made tests and experiments with a hydraulic oil pump. Some installations were made and it became apparent that Dempsey might have a successful pump. Dempsey's pump was announced and offered to the industry at the International Petroleum Exposition at Tulsa in May of 1948. Prior to that time the Dempsey Pump Company had been organized for the purpose of manufacturing and marketing this pump, and defendant, Specialty Sales and Service, Inc., had been employed to promote the sale of the same. As early as December, 1947, Kobe sales agents had reported the activity on the part of Dempsey and were advised to carefully check the performance of the experimental installations and to keep Kobe advised. It was reported that Dempsey was establishing extensive manufacturing facilities to produce hydraulic pumps and that one of Kobe's agents had received inquiries from potential purchasers of the Dempsey pump respecting Kobe's attitude in event they should acquire Dempsey units for tests. The customer was informed that as soon as Dempsey sold a pump, Kobe would in all probability test its legality in court. Kobe's Mid-Continent manager reported that they could not overlook the development by Dempsey and that "this seems to be growing to such proportions that it may require our attention in the not too distant future." There were numerous similar reports prior to the Tulsa exposition.

At the exposition the Dempsey pump created considerable interest among purchasers of this type of equipment. As a result of the exhibition, Dempsey and Specialty received requests for demonstrations or data from 79 prospective purchasers, including many of the major producers of the Mid-Continent area. Coberly and other employees of Kobe were present and called on Dempsey representatives. Coberly requested drawings and a demonstration of the pump because he believed that the new pump would infringe certain of Kobe's patents. Coberly was advised that the patents had been checked by counsel who was of the opinion that no infringement was involved and the drawings were not furnished. Coberly stated that he thought Dempsey was infringing because he did not think that anyone could build a pump without infringing on the Kobe structure or patents held by it. Later Dempsey wrote Coberly and offered to disclose the detailed structure of the Dempsey pump at the Dempsey factory. No reply was received and the Dempsey pump was not examined.

After the Tulsa exposition, Dempsey received 69 further requests for information concerning the pump. This activity was conveyed to Kobe by its representatives with statements that the tests were cutting into Kobe's established customers. Similar memos continued to come in to Kobe throughout the summer of 1948, some of which indicated that the Dempsey pump, selling for less money and outperforming the Kobe product, would afford real competition.

On August 13, 1948, before Kobe had received the drawings of the Dempsey pump, it served written notice of its claim of infringement and demanded that Dempsey immediately discontinue its activities in connection with its pump. Coberly immediately advised his Mid-Continent manager that the notice would answer the inquiries of Kobe's employees and customers and that it was expected that two years would be required to obtain a decision in the case. On August 23rd, Kobe sent a letter to its salesmen notifying them of the notice to Dempsey and stating, "This information * * * is not to be purposely taken to the customers," and advised that further instructions would follow as to how the mat-

422

ter would be handled. Later, the salesmen were instructed not to originate a discussion of the matter with customers but advised them what the reply should be if questioned. On September 14, 1948, this action was filed and two weeks later a circular letter was sent to the purchasing agents of the 40 major purchasers of pumping equipment in the Mid-Continent area. This letter concluded with the statement, "As a user of hydraulic pumping equipment, we feel that you will wish to know and that it is our obligation to inform you of this pending infringement action." Coberly testified that the purpose of the letter was merely to supply information to purchasers whom he believed would be interested. As a result of the suit and the notices, the activities of Dempsey and Specialty were almost at a standstill.

The original complaint alleged only patent infringement. On March 8, 1949, by amendment, the plaintiffs added a cause of action in which unfair competition was alleged. It was charged in this amended complaint that Dempsey had conspired with former Kobe employees to pirate Kobe's trade secrets, its good will, its customers and its employees. It is true that the defendant, Walraven, was a former employee of Kobe but the evidence was undisputed that he had left that employment and organized the Specialty Company for the purpose of distributing and selling oil well equipment prior to the time that he became acquainted with Dempsey or the Dempsey product. No serious attempt was made at the trial of the case to sustain this charge. The court dismissed it and no appeal was taken from that portion of the judgment.

In considering the correctness of the court's conclusion that the plaintiffs had carried on their business in violation of the provisions of the Sherman Act which would prevent their recovery for an infringement of their patents and make them liable for the damages resulting from such violation, certain principles of law must be recognized. Sec. 1 of the Anti-Trust Act declares that every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations, is declared to be illegal. Sec. 2 provides that every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be guilty of a misdemeanor, 15 U.S.C.A. §§ 1 and 2. It is well established that to constitute a monopoly under the provisions of this statute there must be both the power and the purpose or intent to monopolize. United States v. Griffith, 334 U.S. 100, 68 S.Ct. 941, 92 L. Ed. 1236; American Tobacco Co. v. United States, 328 U.S. 781, 814, 66 S.Ct. 1125, 90 L.Ed. 1575; Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416. Ordinarily patent pools when created for legitimate purposes are not illegal in themselves. Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926. Agreements which require licensees to assign future inventions or patents are not in themselves illegal. Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. Such agreements, however, which effect a restraint of trade or create monopolies, if designed for that purpose, are violations of the law. United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701; Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322; Cutter Laboratories, Inc. v. Lyophile-Cryochem Corp., 9 Cir., 179 F.2d 80. It is acknowledged in this case that the plaintiffs did have a complete monopoly of the business relating to hydraulic pumps for oil wells.

Plaintiffs contend that their pooling contracts and the conduct of their business were not such as to constitute a violation of the Sherman Act or a misuse of their patents. First they say that they did not have the power to create a monopoly because their pump was in active competition with other types of pumps used for the same purpose. The record illustrates that there are in use a number of methods of lifting oil from wells. The sucker or rod pump, the electric pump and the gas lift method are those most commonly used. To some

extent Kobe was in competition with the manufacturers of these types of pumps. Particularly in shallow wells, all the pumps may be used under identical conditions, but each method had advantages over the other under different conditions. It is agreed, however, and the court so found, that the hydraulic pump is particularly adapted for deep wells and in wells where the hole has not been drilled exactly perpendicular. The use of the rod type pump and the electrical pump becomes impractical at some of the extreme depths to which wells are now drilled.

■ To constitute a violation of the Act the monopolistic practices need not extend to an entire industry. The statute prohibits the monopolization of "any part of the trade or commerce". This was the holding in United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010; Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; Fashion Originators Guild v. Federal Trade Commission, 2 Cir., 114 F.2d 80, affirmed 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. Then too, the amount of the commerce is not determinative, where, as here, the trade in the commodity is likely to increase. United States v. Columbia Steel Co., 334 U.S. 495, 519, 68 S.Ct. 1107, 92 L.Ed. 1533; United States v. Yellow Cab Co., supra, 332 U.S. at page 225, 67 S.Ct. 1560; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224, note 59, 60 S.Ct. 811, 84 L.Ed. 1129; Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608. Surely the Kobe pump was an "appreciable" part of the oil pump industry.

■ As to the intent or the purpose of monopolies, it is not necessary that the proof include specific intent in a criminal sense. If there is a unification and concentration of power and control over a commodity, this in itself may make a prima facie case of intent and purpose to exercise illegal restraints and to monopolize. It is sufficient to satisfy this requirement if the consequence of a defendant's conduct or business arrangements results in a monopoly. United States v. Griffith, supra; Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619; United States

v. Aluminum Company, supra, 148 F.2d at 430, page 432. In the Aluminum Company case, the court, referring to Sec. 2 of the Act, stated, "To read the passage as demanding any 'specific,' intent, makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing." We think the evidence warrants the finding that the first Kobe-Rodless agreement and the creation of Roko was the beginning of an arrangement to corner the hydraulic pump business for oil wells and that it had that result. The record indicates that every important patent which was issued relating to this field of the industry, although never used, found its way into that pool and no other such pump was manufactured by anyone else but Kobe, Old or New, until Dempsey put one on the market in 1948. Nor do we believe, under the circumstances of this case, that the new organization can escape the consequences of these arrangements. These corporations had full knowledge of the contracts and the accumulation of patents in Roko and the manner in which they were being used. The original contract between the new organization and Old Kobe was conditioned upon the ability of Dresser to obtain the outstanding stock in Roko from Rodless and by that agreement the new corporation intended to put itself in the identical position of Old Kobe. Kobe carried on the business in exactly the same manner and under the same arrangements as Old Kobe. It retained Coberly as its president who was the guiding light in the concentration of these patents in Roko which resulted in the monopoly, and there is no indication that he changed or intended to change the policies of Old Kobe. The purposes of the original contract creating the monopoly were illustrated by the activities of Kobe when Dempsey appeared on the market and became the definite prospect for competition in the hydraulic field. Until then there had been no need for Kobe to display its monopolistic power. A reading of the communications between the company and the sales agents and the testimony as to the activity of different representatives of Kobe can leave no other inference than that the monopolistic purpose of this original arrangement was to be con-

tinued if possible. This suit was no more than a part of the original plan and was designed to nip this competitive threat in the bud. When the suit was filed the plaintiffs had no concrete information that the Dempsey pump infringed any of Kobe's patents. Drawings or models of it had never been examined by or been in Kobe's possession. Of course there was some description of the pump by different witnesses who had seen it, but not from engineers who could determine if there was an infringement. Upon the giving of notice of infringement and the filing of this action, the notices sent out to the trade were veiled threats that purchasers might be involved. Customers were to be advised that in all probability the litigation could not be disposed of short of two years. The amendment of the complaint to include a groundless cause of action that the defendants had entered into a conspiracy with former employees of Kobe to pirate their business further illustrates the intention to put Dempsey out of business, if possible, and continue the monopoly. Coberly's statement at the Tulsa exposition, with no information about the Dempsey pump, that he was of the opinion that it was impossible to make a hydraulic pump without infringing Kobe's patents, also illustrates this design, although it is argued here that Kobe could not have the power to monopolize the field because the basic patents for its pump had expired.

■ Kobe gave wide publicity to the number of patents which it owned. An imposing list of patents was in a conspicuous place in its catalogues, many of which had expired, and they were used to the limit in its attempt to stop Dempsey. The issues presented were issues of fact. The trial court found them against the plaintiff, Kobe. It found specifically that it was guilty of monopolistic practices in violation of law. On this record we cannot say that there is no substantial evidence to support the findings or that they are clearly erroneous. United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690; United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150.

■ There is no merit in the contention that defendants cannot maintain their cross-claim because Kobe did not refuse to grant a license to Dempsey upon reasonable terms. The proof was that such a license was never requested by the defendants and was never refused. No attempt was made to prove that such a license would have been granted had the request been made. In all the years which Kobe manufactured pumps, no license was ever granted to anyone else and the licenses which were reserved in original contracts were eventually eliminated by Kobe. When operating under the Roko agreement, licenses to others were prohibited unless consented to by Old Kobe. There is nothing here to indicate that a different policy had been adopted. The inference is that the old practice was being continued. Of course the refusal to grant a license or a willingness to grant one if requested might be a circumstance in determining whether or not there was an unlawful monopoly. It would not be controlling and would not be a defense if an unlawful monopoly actually existed.

■■ This brings us to the question of the right of the defendants to recover damages and the sufficiency of the evidence to sustain the awards made by the court. Kobe strenuously contends that even though it may be guilty of monopolistic practices such practices did not reach the defendants until the commencement of the infringement action, and any damages suffered by them resulted only from that action. It is said that to allow recovery of damages resulting from the infringement action would be a denial of free access to the courts. We fully recognize that free and unrestricted access to the courts should not be denied or imperiled in any manner. At the same time we must not permit the courts to be a vehicle for maintaining and carrying out an unlawful monopoly which has for its purpose the elimination and prevention of competition. The trial court found that Kobe did not institute the infringement action in bad faith but believed that some of its patents were infringed, and that Kobe intended to secure a judgment which would eliminate defendants as competitors and to

remain in exclusive possession of the whole of the interstate markets for deep well hydraulic pumps for oil wells. The trial court also found that the infringement action and incidental activities by Kobe were intended and designed to further the existing monopolistic purposes.

We have no doubt that if there was nothing more than the bringing of the infringement action, resulting damages could not be recovered, but that is not the case. The facts as hereinbefore detailed are sufficient to support a finding that although Kobe believed some of its patents were infringed, the real purpose of the infringement action and the incidental activities of Kobe's representatives was to further the existing monopoly and to eliminate Dempsey as a competitor. The infringement action and the related activities, of course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused, but when considered with the entire monopolistic scheme which preceded them we think, as the trial court did, that they may be considered as having been done to give effect to the unlawful scheme. Aikens v. Wisconsin, 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154; Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518. The language used in American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575, is appropriate, where it was said:

"It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition."

This seems to be the purport of the court's holding in Kellogg Co. v. National Biscuit Co., 2 Cir., 71 F.2d 662, 666. The result of Kobe's infringement action, its verbal and written statements to the trade, was disastrous to the defendants. There was almost a complete boycott of their products. To hold that there was no liability for damages caused by this conduct, though lawful in itself, would permit a monopolizer to smother every potential competitor with litigation before it had an opportunity to be otherwise caught in its tentacles and leave the competitor without a remedy.

Kobe relies strongly on the cases of Virtue v. Creamery Package Co., 227 U.S. 8, 33 S.Ct. 202, 57 L.Ed. 393; International Visible Systems Corp. v. Remington-Rand Inc., 6 Cir., 65 F.2d 540; and Straus v. Victor Talking Machine Co., 2 Cir., 297 F. 791. The Creamery Package Co. and the Remington-Rand cases do not hold that actions which were designed to further an existing monopoly could not be the basis for damages in an antitrust case. These actions were considered as single and isolated acts and were not preceded by a long history of unlawful monopolization. We are unable to agree with statements to the contrary in the Straus case. The right of those who conduct their businesses in a lawful manner and who do not misuse their patent rights to bring infringement suits and to notify others of the consequences of infringement will in no way be impaired by this ruling.

Considering the narrow bounds to which we are confined on review of the issues of fact in antitrust cases, we are unable to say that there is no substantial evidence to sustain the trial court's finding that the litigation and the conduct of Kobe subsequent thereto was for the purpose of maintaining its monopolistic purposes, or that it is clearly erroneous. United States v. Oregon State Medical Society, supra; Besser Mfg. Co. v. United States, 343 U.S. 444, 72 S.Ct. 838.

The trial court found that the unlawful acts of Kobe induced a continual boycott of the Dempsey product and prevented sales by Dempsey and Specialty and caused substantial damage. In questioning the sufficiency of the evidence to sustain the award, two basic principles of the law of damages are presented: 1, the fact of dam-

age must be established with reasonable certainty, Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Patterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Telluride Power Co. v. Williams, 10 Cir., 172 F.2d 673; 2, the amount of damages may not be based upon mere speculation and conjecture, Story Parchment Co. v. Patterson Parchment Paper Co., supra; Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183; General Finance Corporation v. Dillon, 10 Cir., 172 F.2d 924. We have no difficulty in determining that there is substantial evidence to sustain the court's finding that Dempsey and Specialty were damaged. Proof of the attorney fees allowed is not challenged. The item of expenses necessarily incurred in the litigation was established by a certified public accountant who prepared an exhibit reflecting the books of Dempsey as to these expenditures. The court allowed considerably less than the amount shown by this exhibit. The proof of this item was sufficient. As to the amount allowed for loss of sales, the evidence established that Dempsey had in operation an establishment to manufacture his pumps and auxiliary equipment. Specialty had organized a sales corporation headed by an experienced salesman in this type of equipment. He was a former District Sales Manager of Kobe. Salesmen had been employed and there were other competent salesmen available who were qualified in the field of selling and servicing the Dempsey product. There had been considerable experimental work and testing of the Dempsey pump but it was first introduced to the trade at the Petroleum Exposition in Tulsa late in May of 1948. There was advertising of various types in connection with this introduction. It is undisputed that before and after the exposition great interest was evidenced in this new product by the leading oil producers in the Mid-Continent area. Specialty had called upon about 350 representatives of 40 important oil companies. In the month of June immediately following the oil show, Specialty made three installations upon leases of prospective purchasers, one

in July, eleven in August, one in September prior to the commencement of the infringement action, and only one additional installation was made in the following six months. The expanding market and the interest in the pumps almost disappeared following the institution of the litigation and the notice to the trade. Demands for indemnity against damages caused by infringement were immediately received from nine major oil producing companies who had installations of the Dempsey pumps. In a number of instances payment for pumps was deferred. Thereafter in almost every sales interview the infringement action was an obstacle to the sale of the Dempsey pump. Some prospective purchasers stated that pending transactions would be discontinued because of the claims of Kobe. The record clearly illustrates that the actions of Kobe "knocked the props from under" the sales and the interest in the Dempsey products. The sales that were made thereafter principally were those resulting from negotiations prior to the infringement action and the notice, and after the purchaser had been indemnified against loss. The Dempsey pump apparently gave a very satisfactory performance and sold for from $143.00 to more than $600.00 per unit less than the Kobe pump.

As to the proof necessary to sustain an award for damages where the existence of damages has been shown, we said in Hoffer Oil Corp. v. Carpenter, 10 Cir., 34 F.2d 589, 592, "The general rule is that, where the cause and existence of damages has been established with requisite certainty, recovery will not be denied because such damages are difficult of ascertainment." In Indian Territory Illuminating Oil Co. v. Townley, 10 Cir., 81 F.2d 159, 160, we again said, "The rule which precludes the recovery of uncertain damages applies to those that are not the certain result of the wrong, not to those which are definitely attributable to the wrong and only uncertain in respect of their amount." The Supreme Court, in Story Parchment Co. v. Patterson Parchment Paper Co., supra [282 U.S. 555, 51 S.Ct. 250], said, "It is true that there was uncertainty as to the extent of the damage, but there was none

as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount." In Bigelow v. RKO Radio Pictures, supra [327 U.S. 251, 66 S. Ct. 580], it was said that "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." It was also observed in that case, " 'The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery' for a proven invasion of the plaintiff's rights." The evidence here is, we think, well within these rules. It supports a just and reasonable inference that Dempsey and Specialty were damaged and in the amounts which the trial court found. To sustain the amount of the damage, Dempsey and Specialty produced all the evidence available under the circumstances. They showed that they had the facilities, the personnel and the finances to manufacture and market the Dempsey products. They had elaborate surveys and samplings of the market and the demands for this product prepared by experts. One expert with long experience in the field in marketing hydraulic pumps and who knew the Dempsey pump and its performance as compared with others, testified that in his opinion Dempsey would have sold considerably more pumps and auxiliary equipment than that allowed by the court had there been no interference on the part of Kobe. These experts believed that the growth curve of the Dempsey product would have continued upward over the period in question principally because of the pump's performance and its price. In view of all the evidence, including the fact that during the relevant part of 1948, Kobe averaged 45 installations per month

and 23 per month for all of 1949, it would appear that the trial court took a conservative estimate when it found that except for the Kobe interference, Dempsey and Specialty would have sold six of the smallest and lowest priced pumps per month for the period in question.

Complaint is made of the method which the court used in computing the damage. In assessing damages the court used the difference in the sale price of the pumps and their direct cost, finding that the six pumps per month could have been manufactured without additional plant, machinery, tools or other capital requirements. The method used was approved in Bigelow v. RKO Radio Pictures, supra, 327 U.S. at page 253, 66 S.Ct. at page 579, where it was said, "the plaintiff sought to show his damage by proof of the difference between the amounts actually realized from his business after the conspiracy became effective, and what, but for the conspiracy, would have been realized by it from sales at reasonable prices, the evidence of which was the amount by which his current prices were higher before the conspiracy than after, and by the extent to which the value of plaintiff's business property had declined after the conspiracy had begun to operate." The losses by Specialty were computed at its contract price and were directly contingent upon the loss of sales of Dempsey.

■ The appeal and cross-appeal present questions as to the validity and infringement of plaintiff's patent No. 1907947 and claims 21, 22, 23, 24, 25 and 26 of patent No. 2473864 herein referred to as patent 864. Since the commencement of this action, patent No. 1907947 has expired and so far as this action is concerned consideration of the validity and infringement of that patent is now unnecessary. We have, however, examined the record and concluded that the trial court was correct in its finding that patent No. 1907947 is valid and infringed by the Dempsey device.

■ The 864 patent shows and claims a hydraulic pump for an oil well which pump has a fluid engine coupled to a single acting pump which includes an engine piston assembly of the differential-area

type having a small area constantly exposed to high pressure and a larger area intermittently exposed to high and low hydraulic pressure which actuates the piston assembly within the pump cylinder. The motor piston and the pump piston are rigidly connected and move as a unit.[3] This pump is made up of a combination of

3. The patent specification which generally describes the pump and its functions in part reads:

"Conventional fluid-operated pumps of the displacement type, such as illustrated in my Patent No. 2,311,157, issued February 16, 1943, include a motor cylinder having a pump piston therein and connected by a piston rod with a motor piston, and master valve mechanism for alternatively directing high-pressure operating fluid, such as oil, to opposite ends of the motor cylinder to reciprocate the piston assembly to pump well fluid from the pump cylinder. In such devices the pistons have a substantially fixed stroke length, and reversal of direction of the pump piston cannot take place unless and until it completes its stroke.

"Many oil wells produce oil having a high percentage of solids, such as, for example, sand, therein, and when such a conventional type of fluid-operated pump is utilized in pumping such a well it is commonly found that solids, such as sand, in the oil tend to collect in the pump cylinder. When this occurs the conventional pump piston may squeeze the oil through the sand in the pump cylinder, leaving a solid core of sand which stops the travel of the pump piston before it completes its stroke and prevents completion of the stroke. Since such pumps are of the constant displacement type, when the pump piston is prevented from completing its stroke the motor piston likewise stops, and the pump must normally be removed from the well to permit the accumulated sand to be removed from the pump. This requires an expensive pulling job, and complete disassembly of the pump for cleaning, and the well normally lies idle during such an operation, all of which is very undesirable.

"It is therefore a primary object of this invention to provide a pump of the fluid-operated type in which the pump piston will reverse its stroke when it contacts a mass of sand or other solid material in the pump cylinder. This prevents stoppage of the pump and permits uninterrupted production from the well, even though perhaps at somewhat reduced capacity.

＊　＊　＊　＊　＊　＊

"A further object of the invention is to provide such a pump which is of the single-acting type, but in which high pressure operating fluid is employed to perform both strokes of the pump piston. I also prefer to provide such a pump in which the downstroke, or return stroke, is at relatively high velocity and in which the upstroke, or working stroke, is at relatively low velocity, so that the suction stroke utilizes about 75% to 90% of the total time of the pump cycle, which is particularly desirable where such a pump is employed to pump heavy oil, and this is another object of the invention. Such a construction has the added advantage that a high-velocity downstroke of the pump piston causes a rapid discharge of oil thereby which causes considerable turbulence tending to keep sand or other solid matter in suspension in the oil so that it can be discharged from the pump with the oil, and this is a further object of the invention. The low velocity of the pump piston on its working or intake stroke also has the added advantage that it does not reduce the intake pressure substantially below the fluid pressure in the well, which is important because if the intake or working stroke is rapid the pressure in the inlet end of the pump cylinder may be reduced to a value at which gas in solution in the oil flashes out thereof to form a froth of free gas in the pump cylinder which greatly reduces the volumetric efficiency of the pump.

＊　＊　＊　＊　＊　＊

"Another object of the invention is to provide such a pump which will operate effectively to handle oil or other fluid containing sand or other solid matter. I accomplish this, in part, by the use of pump intake and discharge valves which are large relative to the pump diameter, which also facilitates the pumping of heavy or viscous crude oil, and is a separate object of the invention.

"A further object of my present invention is to provide a fluid-operated pump having a unitary motor piston and main valve, which simplifies the construction and reduces the cost of manufacture.

"Still another object of the invention is to provide a fluid-operated pump in which the operating fluid is supplied through a central tubular member on which the motor piston reciprocates, so that the motor and pump cylinders can be simple tubular members. This feature has the added advantage that the fluid pressure of the operating fluid is at all times directed radially outwardly in the motor and pump cylinders."

elements which are referred to in the claims in suit. As to these claims the trial court made the following finding:

"Claims 21, 22, 23, 24, 25 and 26 of United States Letters Patent No. 2,473,864 are here involved. The only novelty in these claims is a mounting of a differential area main valve in a differential area piston in a fluid-actuated well pump. Both differential area pistons and differential area valves were old before the time of this patent, and it involved no invention to mount a differential area valve in a differential area piston and none of said claims define an invention."

It is conceded that "both differential-area pistons and differential-area valves were old before the time of this patent," but it is contended that the piston assembly is a combination of old elements which is more than mechanical skill and is novel to the art. It is further contended that in claims 23 and 24 there is included a wholly new element unknown to the prior art, namely, "a small unbalanced area on the piston assembly to which a fluid pressure differential is constantly applied" in a downward direction causing the downstroke of the piston assembly. Claims 21 and 24 are illustrative of all those involved. The elements of claim 21 are said to be: 1, a cylinder means; 2, a piston means extending into the cylinder means and reciprocal relative thereto and having two force areas, one relatively large and one relatively small, and the smaller area in continuous open communication with a force of high pressure operating fluid; 3, a valve cylinder in the piston means; 4, differential-area main tubular valve means in the valve cylinder providing communication by the larger force area and such source and alternately between such larger force area and a lower fluid body; 5, a pilot valve extending into such valve means adapted to open communication between the large valve area and alternately such source and such body.

With the exception of the placing of the valve cylinder piston permitting the carrying of the differential-area main valve in a differential-area piston, it is not seriously contended that these elements were undis-

closed in prior patents. For this reason we find it unnecessary to make the comparisons of the prior disclosures but will confine our discussion to the combination. The standards which should be applied in determining whether a combination amounts to an invention were stated in Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162, to be that: "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly." We said in Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 192 F.2d 110, 111: "No prior patent or disclosure shows all of the elements of any one of the claims in a single device, but all of the elements in each of the several claims are disclosed by prior patents where they perform the same functions as they perform in the device of the patent in suit.

"When the respective individual functions of the elements assembled are not changed and where they produce no result other than the added results of such functions, there is a mere aggregation of elements.

"When the elements are so united that by their reciprocal influence upon each other, or by their joint action on a common objective, they perform additional functions and accomplish additional results, the union is a true combination.

"The result must be due to the joint and cooperative action of all the elements, not a mere aggregation of the several results of the separate elements acting independently; it must be the product of the

combination and not a mere aggregate of several results, each a complete product of one of the combined elements." Tropic-Aire, Inc., v. Cullen-Thompson Motor Co., 10 Cir., 107 F.2d 671; Independent Oil Well Cementing Co. v. Halliburton, 10 Cir., 54 F.2d 900, 905.

The combination of reciprocating pistons in fluid actuated pumps which included valve mechanism for controlling the flow of fluid to the opposite ends of a piston assembly was first disclosed in 1878 in Faucett Patent 204,015. The general combination shown in patent 864 was disclosed in Gage 1907947, Gage 1544898, Kellogg 1597162, Tucker 1614765, Humphreys 1577971, Coberly 2081220 and 2081223, and Vetrano 2266289. The arrangement control valve in the piston assembly is new but we agree with the trial court that this is nothing more than the application of mechanical skill and is not an invention. It required no greater skill or higher thought than that which would be expected of a mechanic trained and skilled in the art. The old and well known elements of the prior art perform the same mechanical functions in these claims as they have been known to perform in the prior art and they produce the same result and cannot be considered an invention. The changes made in this device would readily occur to one skilled and acquainted with the already crowded art. Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005; Atlantic Works v. Brady, 107 U.S. 192, 199, 2 S.Ct. 225, 27 L.Ed. 438; Hutchinson Mfg. Co. v. Mayrath, supra; Richards & Conover Co. v. Leishman, 10 Cir., 172 F.2d 365, 369, certiorari denied 336 U.S. 952, 69 S.Ct. 882, 93 L.Ed. 1107; Turner v. Goldstein, 10 Cir., 154 F.2d 338; American Laundry Mach. Co. v. Strike, 10 Cir., 103 F.2d 453; Callison v. Boyle, 10 Cir., 95 F.2d 575; Lyman Gun Sight Corp. v. Redfield Gun Sight Corp., 10 Cir., 87 F.2d 26; Fisher Governor Co. v. C. F. Camp Co., 10 Cir., 40 F.2d 341; Linville v. Milberger, 10 Cir., 34 F.2d 386. It is true that the claims define a complex hydraulic pump structure but it is no more complex than those defined long ago. All that has been done here is to assemble old and known elements and use them for the same purpose as they were previously used.

The language used by this court in Shaffer v. Armer, 10 Cir., 184 F.2d 303, 307, is particularly applicable where it was said: "'The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts.' Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438. The device must not only be 'new and useful,' it must also amount to 'invention or discovery,' Thompson v. Boisselier, 114 U.S. 1, 11, 5 S.Ct. 1042, 1047, 29 L.Ed. 76; and 'perfection of workmanship, however much it may increase the convenience, extend the use, or diminish expense, is not patentable.' Reckendorfer v. Faber, 92 U.S. 347, 356–357, 23 L.Ed. 719; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58. And to make sure that a monopoly is not granted for mere perfection of workmanship, the courts closely scrutinize claims to combinations for improvements in a crowded art. Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 10, 67 S.Ct. 6, 91 L.Ed. 3; Hollywood-Maxwell Co. v. Streets of Tulsa, 10 Cir., 183 F.2d 261." It is also well settled that a nonused patent positioned in a crowded art should not be aided by a broad interpretation of the claims. American Laundry Mach. Co. v. Strike, 10 Cir., 103 F.2d 453, 457.

We also agree with the trial court that the "relatively small unbalanced area on the piston assembly to which fluid pressure differential is constantly applied" does not constitute a wholly new element which is patentable. We think this principle was clearly anticipated in the Vetrano patent number 2266289 where the upper engine piston provides a large balanced area on the downstroke the same as 864, and the secondary engine piston provides a small unbalanced area to which a pressure fluid differential is constantly applied in one direction substantially the same as 864. Since the patent is invalid there is no need to consider the correctness of the trial court's decision as to the infringement.

Judgment is affirmed.