## In re INDEPENDENT SERVICE ORGANIZATIONS ANTITRUST LITIGATION.

This Document Applies To:  CSU Holdings, Inc., et al., v. Xerox Corp. (D.Kan. No. 94–2102–EEO)

Civ.A. No. MDL–1021.

United States District Court, D. Kansas.

March 19, 1997.

Eric D. Braverman, Employers Reinsurance Corporation, Overland Park, KS, P. John Owen, Lori R. Schultz, Morrison & Hecker, Kansas City, MO, Michael C. Man-

ning, Morrison & Hecker, Phoenix, AZ, for CSU Holdings Inc. and Copier Services Unlimited, Inc.

James A. Hennefer, San Francisco, CA, Maxwell M. Blecher, for Acquisition Specialists, Inc., Tecspec, Inc., Consolidated Photo Copy, Inc., Copier Rebuild Center, Inc., CPO Ltd., Creative Copier Services, Inc., Gradwell Company, Inc., Graphic Corporation of Alabama, International Business Equipment, Inc., Laser Resources Inc., Laser Resources of Minnesota, Inc., Laser Solutions, Inc., Laser Support and Engineering, Inc., Nationwide Technologies, Inc., Reprographics Resources Systems, Inc., Resources Systems, Inc., Suntone Industries, Inc., Technical Duplication Services, Inc., X-Tech Systems Inc., XER-DOX Inc., and Xerographic Copies Services, Inc.

Peter K. Bleakley, Arnold & Porter, Washington, DC, Peter W. Marshall, Xerox Corporation, Stamford, CT, Michael G. Norris, Norris, Keplinger & Logan, L.L.C., Overland Park, KS, C. Larry O'Rourke, E. Robert Yoches, Vincent P. Kovalick, Leslie I. Bookoff, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC, for Xerox Corporation.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Senior District Judge.

This matter is before the court on defendant's motion for summary judgment on its willful patent infringement counterclaims (Doc. # 362) and defendant's motion for summary judgment on plaintiffs' antitrust claims (Doc. # 410). After careful consideration of the parties' briefs and oral argument on defendant's motion for summary judgment on plaintiffs' antitrust claims, the court is prepared to rule. For the reasons set forth below, both motions are denied.

### Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Essentially, the inquiry as to whether an issue is genuine is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. An issue of fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. This inquiry necessarily implicates the substantive evidentiary standard of proof that would apply at trial. *Id.* at 252, 106 S.Ct. at 2512.

Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on his pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

"[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope

that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Where the nonmoving party fails to properly respond to the motion for summary judgment, the facts as set forth by the moving party are deemed admitted for purposes of the summary judgment motion. D. Kan. Rule 56.1.

## Analysis

### I. Defendant's Patent Infringement Counterclaims.

Defendant contends that it is entitled to summary judgment on its willful patent infringement counterclaims because (1) plaintiff has infringed on Xerox's patents for certain copier and printer replacement parts and (2) plaintiff's affirmative defenses to defendant's patent infringement counterclaims are invalid as a matter of law.

#### A. *Factual Background.*

Among the patents asserted by Xerox in its patent infringement counterclaim against CSU are several key copier and printer replacement parts, including fuser heat and pressure rolls, dicorotrons, and document handler belts. CSU often replaces these parts during the service and refurbishment of copiers and printers. In discovery, Xerox sought the production by CSU of representative copier and printer parts that CSU purchased from vendors other than Xerox. CSU produced seven parts, which are the subject of this motion. Each of the parts produced by CSU infringes Xerox's patents either literally or under the doctrine of equivalents.

The remaining facts presented in this section are uncontroverted by Xerox for purposes of this motion only.[1] In 1984, Xerox developed its first "parts policy," in which it declared it would not sell "parts which are

unique to the '10' Series products in memory writers" to any Independent Service Organization ("ISO") unless the ISO also was an end-user of the product. In January 1987, the parts policy was expanded to apply to newer "9" Series models and all "10" Series copiers, plus all new Xerox products introduced after the effective date of the policy.

Xerox did not enforce its parts policy until early 1989. At that time, Xerox representatives decided that the only way to stop the competitive threat posed by ISOs, such as CSU, was to cut off the parts availability to these parties. In January 1989, Xerox tightened enforcement of its existing policies and cut off CSU's direct purchase of restricted parts from Xerox. Xerox also implemented an "on-site end-user verification" procedure when certain ISOs or their customers ordered parts from Xerox. The policy, which was implemented in June 1989, initially applied solely to the six most successful ISOs, including CSU.

As a result of Xerox's parts policies, CSU did not have an assured source of supply of parts necessary to service Xerox copiers and printers. CSU used parts cannibalized from used Xerox equipment, parts obtained from other ISOs, and parts purchased through a limited number of customers. CSU also obtained parts from Rank Xerox, a majority-owned European affiliate of Xerox, for approximately one year until Xerox forced Rank Xerox to stop selling parts to CSU and other ISOs.

CSU claims that Xerox also decided to use its intellectual property rights as a weapon to defeat ISO competition. Xerox made its legal counsel an integral part of this corporate strategy. CSU claims that Xerox used its legal counsel to threaten and/or bring patent and copyright infringement suits against ISO competitors.

In 1994, Xerox settled an antitrust lawsuit brought by a class of ISOs in the United States District Court for the Eastern District of Texas (the "*R & D* Litigation"). CSU

---

1. Xerox claims that many of these facts are irrelevant to the instant motion because (1) Xerox has a lawful right to refuse to license or sell its patented parts and (2) some of the facts do not pertain specifically to the patents at issue in this

motion. The court has resolved both issues against Xerox, *see infra* section I.C., and therefore finds that the facts outlined in this section are relevant to the instant motion.

opted out of the R & D settlement on the same day it filed the instant action against Xerox. Pursuant to the *R & D* settlement, Xerox agreed to suspend its restrictive parts policy for a period of six and one-half years. The settlement also compelled Xerox to license diagnostic software, an essential component for service, for four and one-half years.

After the *R & D* settlement, Xerox intensified its efforts to use price as a weapon to defeat ISO competition in the service market. Xerox knew that if it must sell parts and licensed software to ISOs, it could achieve the same effect as not selling the product by charging exorbitant prices for those products. Xerox intentionally set the prices of its patented parts at high levels to act as a weapon against ISOs and to maintain Xerox's monopoly of the service market.

Xerox charges ISOs markups of as much as 2,000% or more on its parts. Xerox does not charge its customers who also service their own machines ("self-servicers") the same parts prices it charges ISOs. For example, ISOs are charged approximately four times as much as self-servicers for some parts.

Xerox explicitly set the price of its patented parts, not to recoup its development costs, but to force ISOs to raise the prices they charge customers. Xerox's goal of its pricing strategy was to eliminate ISO competition and capture 100% of the service market. Xerox used its control over the prices of parts and diagnostic software to exclude ISOs in the service market or to maintain its supra-competitive prices over its parts.

### B. *Xerox's Affirmative Case of Patent Infringement.*

As noted above, Xerox has presented evidence that CSU has infringed Xerox's patents either literally or under the doctrine of equivalents. CSU conceded in its opposition brief that "Xerox has lawful patents" and that "CSU's use of certain parts constitutes a form of facial infringement." CSU confirmed at the pretrial hearing on March 13, 1997, that it did not contest that CSU's use of certain parts constitutes infringement of Xerox's patents. In addition, CSU has of-

fered no evidence to refute the evidence of infringement presented by Xerox in support of its summary judgment motion.

Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, the court finds that the following facts exist without substantial controversy and thus will be deemed established at trial of this action:

> CSU has infringed Xerox's patents either literally or under the doctrine of equivalents by CSU's use of the 97X0 fuser pressure roll, 97X0(w/ MOD V) fuser heat roll, 97X0(w/o MOD V) fuser heat roll, 1090 family fuser heat roll, 1090 family dicorotron w/ dag coating, 1090 family dicorotron w/o dag coating, and 1065 document handler belt. Xerox has lawful patents for each of these parts registered as U.S. Patent No. 4,149,797, No. 4,196,256, No. 4,272,179, No. 4,373,239, No. 4,314,006, No. 4,585,322, and No. 4,258,258.

Although CSU has conceded that its use of certain parts constitutes infringement of Xerox's lawful patents, CSU claims that it has valid defenses of patent misuse, estoppel, and laches, which preclude summary judgment. The above factual findings are subject to CSU's defenses to be presented at trial.

### C. *CSU's Patent Misuse Affirmative Defense.*

■ CSU claims that Xerox misused its patents by attempting to use its patents over certain copier and printer parts to create or maintain a monopoly in the copier and printer service market. In sum, CSU maintains that Xerox has attempted to thwart ISO competition in the service market by (1) refusing to license its patented products or setting the license fee at an exorbitant price, and (2) using its intellectual property rights, including its assertion of a counterclaim for patent infringement in the instant action.

To prevail on a defense of patent misuse, an alleged infringer must establish that the patent holder has used its patent to secure an exclusive right or limited monopoly beyond the scope of the patent in contravention of public policy. *See Morton Salt Co. v. G.S. Suppiger Co.,* 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1942). A patent holder's

conduct "may constitute patent misuse without rising to the level of an antitrust violation." *Senza–Gel Corp. v. Seiffhart,* 803 F.2d 661, 668 (Fed.Cir.1986); *see Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 140, 89 S.Ct. 1562, 1585–86, 23 L.Ed.2d 129 (1969). An antitrust violation, however, generally will establish misuse.[2]

Although a firm generally can refuse to deal with its competitors, "such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal." *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 483 n. 32, 112 S.Ct. 2072, 2090 n. 32, 119 L.Ed.2d 265 (1992) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 597, 105 S.Ct. 2847, 2854–55, 86 L.Ed.2d 467 (1985)). On the other hand, the patent statute provides that a patent holder can refuse to license a patented product without being guilty of patent misuse. *See* 35 U.S.C. § 271(d)(4). Although the patent statute does not specify any exceptions to this general rule, courts traditionally have recognized that patent holders cannot use their patent to justify anticompetitive conduct beyond the limit or scope of the patent grant. *See Zenith,* 395 U.S. at 136, 89 S.Ct. at 1583 ("But there are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee."); *Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964) (*"Absent any overriding unlawful conduct,* 'a patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly.' ") (emphasis added); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 230, 84 S.Ct. 784, 788, 11 L.Ed.2d 661 (1964) ("[T]he patent monopoly may not be used in disregard of the antitrust laws."); *United States v. Line Material Co.,* 333 U.S. 287, 308, 68 S.Ct. 550, 561, 92 L.Ed. 701 (1948) ("Possession of a valid patent or patents does not give the patentee any exemption from the provi-

sions of the Sherman Act beyond the limits of the patent monopoly."); *see also* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 704 (1978) ("a patent is a species of property whose use and disposition are no more immune from antitrust scrutiny than other property"). "Surely, a § 2 violation will have occurred where, for example, the dominant competitor in a market acquires a patent covering a substantial share of the same market that he knows when added to his existing share will afford him monopoly power." *See SCM Corp. v. Xerox Corp.,* 645 F.2d 1195, 1208 (2d Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132 (1982). Thus, the right to refuse to sell a patented invention is not absolute even within the market of the patented work.

In this case, CSU alleges that Xerox used its various patents for copier and printer parts to exclude competitors in the service market, which CSU contends is beyond the scope of the patented inventions. The Supreme Court "has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to [antitrust] liability if 'a seller exploits his dominant position in one market to expand his empire into the next [market].' " *Eastman Kodak,* 504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29 (quoting *Times–Picayune Pub. Co. v. United States,* 345 U.S. 594, 611, 73 S.Ct. 872, 882, 97 L.Ed. 1277 (1953)). The Supreme Court's statement in *Eastman Kodak* immediately followed the Court's rejection of a proposal to grant per se antitrust immunity to manufacturers competing in the service market. The Supreme Court consistently has found that:

> the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limit-

---

**2.** An alleged infringer also must establish a sufficient nexus between the patent holder's alleged misconduct and the patents at issue in the litigation. *See Kolene Corp. v. Motor City Metal Treating, Inc.,* 440 F.2d 77, 84–85 (6th Cir.), *cert. denied,* 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971). Xerox's parts policies applied to "10" Series products in memory writers, "9"

Series models, "10" Series copiers, plus all new Xerox products introduced after January 1987. Further, CSU has offered evidence that many of Xerox's policies applied to all patented and copyrighted products. CSU's evidence of patent misuse certainly is related to the specific patents that are the subject of Xerox's infringement counterclaim.

ed monopoly not granted by the Patent Office and which it is contrary to public policy to grant.

*Morton,* 314 U.S. at 492, 62 S.Ct. at 405. Courts emphasize that antitrust liability may arise when a patent or copyright holder uses its rights to expand its reach into other markets not within the scope of the patent or copyright. *See Atari Games Corp. v. Nintendo of Am., Inc.,* 897 F.2d 1572, 1576 (Fed. Cir.1990) (patent); *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1187 (1st Cir.1994) (copyright); *see also Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.,* 497 F.2d 285, 290–91 (10th Cir.1974) (finding by negative implication that a bad faith effort, contrary to the spirit of copyright and antitrust law, to enforce one's copyright is condemned by the Sherman Act), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975).[3] "When a patent owner uses his patent rights not only as a shield to protect his invention, but as a sword to eviscerate competition unfairly, that owner may be found to have abused the grant and may become liable for antitrust violations when sufficient power in the relevant market is present." *Atari,* 897 F.2d at 1576. A finding of antitrust liability against Xerox would support CSU's patent misuse defense, which in turn would preclude Xerox's recovery on its patent infringement counterclaims. *See Senza–Gel,* 803 F.2d at 668 n. 10; *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416, 422–24 (10th Cir.), *cert. denied,* 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651 (1952).

▇ Xerox, relying on section 271(d)(4) of the patent statute, maintains that it has an absolute right to refuse to license or sell patented works to its competitors, regardless of its intent or the anticompetitive effects in other markets. The Patent Reform Act of 1988 added subsection 271(d)(4), which provides that no patent owner shall be deemed guilty of misuse by reason of having "refused to license or use any rights to the patent." 35 U.S.C. § 271(d)(4). The Supreme Court traditionally has interpreted the language of section 271 in light of the relevant doctrines "as they had developed prior to Congress' attempt to codify the governing principles." *Dawson Chem. Co. v. Rohm & Haas Co.,* 448 U.S. 176, 187, 100 S.Ct. 2601, 2609, 65 L.Ed.2d 696 (1980). The Supreme Court also has emphasized that any exceptions to the patent misuse doctrine codified in section 271 should be construed "in light of this nation's historical antipathy to monopoly and of repeated congressional efforts to preserve and foster competition." *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 530, 92 S.Ct. 1700, 1708, 32 L.Ed.2d 273 (1972).

A close look at the legislative history of section 271(d)(4) reveals that this exception merely codified existing case law regarding patent misuse and did not grant patent holders absolute immunity from the antitrust laws. Representative Kastenmeier stated that "codification of the 'refusal to use or license' as not constituting patent misuse is consistent with the current caselaw and makes sense as a matter of public policy." 134 Cong. Rec. H10646, H10648 (Oct. 20, 1988). Representative Kastenmeier cited two cases in the legislative history as support for the amendment. Neither case supports the proposition that a patent holder may use its patent to create or enforce a monopoly in a market separate from the patented invention. *See SCM,* 645 F.2d at 1203–06; *Continental Paper Bag Co. v. Eastern Paper Bag. Co.,* 210 U.S. 405, 426–30, 28 S.Ct. 748, 754–56, 52 L.Ed. 1122 (1908). Both cases at most stand for the general principle that a patent holder can exclude competitors within the market of the patented invention (i.e. horizontal competitors). Indeed, Representative Kastenmeier stated that "[t]he underlying policy for this [misuse] doctrine has been an effort by the courts to prevent a person who has obtained a Government granted right to exclude competition from overreaching the scope of the patent." 134 Cong. Rec. at H10647. The amendment adding section 271(d)(4) apparently only reaffirmed this policy. The statutory amendment did not alter the traditional principle that a patent holder cannot use its patent to acquire or maintain a

---

**3.** Indeed, this court previously found that "[a]n exercise of rights under a copyright can lead to antitrust liability." *In re Independent Service Or-* *ganizations Antitrust Litigation,* 910 F.Supp. 1537, 1543 (D.Kan.1995).

monopoly in a market separate from the patented invention. Courts also continue, even after passage of section 271(d)(4), to follow the same general policy underlying the patent misuse doctrine. Most importantly, courts have not granted patent holders per se immunity from the antitrust laws based on their right to refuse to license a product. *See Eastman Kodak*, 504 U.S. at 479 n. 29, 112 S.Ct. at 2089 n. 29; *see also Servicetrends, Inc. v. Siemens Medical Sys., Inc.*, 870 F.Supp. 1042, 1056 (N.D.Ga.1994) ("*As a general proposition*, Siemens AG's lawful patent does give it the right to refuse to sell or license the patented device.") (emphasis added).

■ This court simply cannot accept Xerox's proposition that patent and copyright holders can never be guilty of misuse based on their unilateral refusal to sell or license a product. There are limited circumstances where such conduct may give rise to an antitrust violation and accordingly provide the basis for a patent or copyright misuse defense. *See Image Technical Service, Inc. v. Eastman Kodak Co.*, 1996 WL 101173, at *2 (N.D.Cal. Feb.28, 1996) (although "caselaw supports the general proposition that patent or copyright holders are not required to sell their protected products in order to avoid antitrust liability," that principle is not applicable because "Kodak's [lawful] refusal to sell its protected parts is connected with an illegal parts policy adopted to further monopolistic ends"); *see also Data General*, 36 F.3d at 1187 ("exclusionary conduct can include a monopolist's unilateral refusal to license a copyright"); *Bell Atlantic Bus. Sys. Servs., Inc. v. Hitachi Data Sys. Corp.*, 1995–2(CCH) Trade Cases ¶ 71,258, 1995 WL 798935 (N.D.Cal. Mar.10, 1995) ("a material factual dispute exists over whether Hitachi Data's refusal to sell or license its copyrighted diagnostics and manuals constitutes unlawful exclusionary conduct"); *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919) ("in the absence of any purpose to create or maintain a monopoly," the Sherman Act does not restrict a firm's right to refuse to sell its product).

The history of the *Eastman Kodak* case also supports the proposition that a firm's unilateral refusal to sell or license its products may give rise to antitrust liability in certain circumstances. There, the district court originally granted Kodak's motion for summary judgment on plaintiff's section 2 Sherman Act claim, finding that "Kodak's unilateral refusal to sell its parts to plaintiffs does not violate § 2." *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 1988 WL 156332, at *4 (E.D.Cal. Apr.18, 1988). The Ninth Circuit reversed the district court, stating that

> [t]he district court found that Kodak had no duty to deal with its competitors. We agree with the district court's statement of this general rule; however, we believe that there are material issues of fact concerning whether Kodak falls within one of the exceptions to it. A monopolist may not refuse to deal with a competitor in an exclusionary attempt to impede competition without a legitimate business reason. In the same spirit, a monopolist may not retaliate against a customer who is also a competitor by denying him access to a facility essential to his operations, absent legitimate business justifications.

*Image Technical Service, Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 620 (9th Cir.1990) (citations omitted). The Supreme Court affirmed the Ninth Circuit's ruling, again stating that the right to refuse to sell to competitors is not absolute. *See Eastman Kodak*, 504 U.S. at 483 n. 32, 112 S.Ct. at 2090 n. 32.

Xerox requests this court to read the patent statute (section 271(d)(4)) in a vacuum, without reference to prior caselaw that it codifies and without reference to the antitrust laws. In essence, Xerox suggests that an unlawful end (monopolization of the service market) cannot be accomplished by lawful means (refusal to sell or license its patented and copyrighted products). This proposition has been rejected in almost every area of the law, including antitrust law. *See Eastman Kodak*, 1996 WL 101173, at *2; *Kobe*, 198 F.2d at 424 (although defendant's actions standing alone were not in themselves unlawful, these actions may be considered as giving effect to an unlawful scheme to monopolize).

The court finds that there are genuine issues of material fact regarding CSU's patent misuse defense to Xerox's infringement counterclaims precluding summary judgment in favor of Xerox. CSU has presented evidence that Xerox has used its patent rights for equipment and parts to acquire and/or maintain its monopoly power in the service market. Xerox maintains that all of its alleged practices were reasonably within the patent grant and, therefore, cannot constitute misuse. For purposes of this motion, Xerox does not even address whether there are separate markets for parts and service. Xerox, in effect, has conceded that its policies regarding its patented parts have helped it exclude competitors in the service market. Assuming that there are separate markets for parts and service, which the court must assume for purposes of this motion, there is sufficient record evidence for a fact finder to conclude that Xerox improperly attempted to expand the scope of its patent grant for parts to exclude competitors in the service market.[4]

■ Xerox also contends that prosecution of its infringement counterclaims cannot constitute patent misuse. Again, Xerox relies on the patent statute, which precludes a finding of misuse when the patent holder seeks "to enforce his patent rights against infringement." 35 U.S.C. § 271(d)(3). A finding of misuse is precluded only if the patent infringement suit is brought in good faith. *See Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.* 45 F.3d 1550, 1558 (Fed.Cir.1995) (a lawsuit brought in bad faith and with an improper purpose may constitute patent misuse or a violation of the antitrust laws); *W.L. Gore & Assocs. v. Carlisle Corp.,* 529 F.2d 614, 625 (3d Cir.1976) ("an infringement suit brought in good faith does not constitute patent misuse"); *Kobe,* 198 F.2d at 425 (patent holder may be guilty of misuse if the real purpose of the infringement action is to further an existing monopoly); *Conceptual Eng'g Assocs., Inc. v. Aelectronic Bonding,*

*Inc.,* 714 F.Supp. 1262, 1269 (D.R.I.1989) (although section 271 provides that a patent owner has the right to enforce his patent, section 271 does not condone bad faith conduct).

Xerox, relying on the *Noerr–Pennington doctrine,*[5] argues that its prosecution of its patent and copyright infringement counterclaims against CSU is immune from antitrust liability. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 56–60, 113 S.Ct. 1920, 1927–28, 123 L.Ed.2d 611 (1993) *("PRE").* Xerox claims that its subjective intent in bringing its infringement counterclaims is irrelevant. In *PRE,* the Supreme Court held that a copyright infringement suit was immune from antitrust liability unless the defendant could establish that the suit was objectively baseless. The Supreme Court stated that

the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.

*Id.* at 60, 113 S.Ct. at 1928.

■ In this case, CSU relies on Xerox's subjective intent in bringing its infringement counterclaims against CSU as a basis for its misuse defense. CSU has presented evidence that Xerox's prosecution of its infringement counterclaims in this action is a logical extension of its alleged scheme to monopolize the service market. Based on the present record, the court cannot find that evidence of Xerox's intent in prosecuting its infringement counterclaims in this action is precluded as a matter of law. First, the *Noerr–Pennington* doctrine provides *antitrust* immunity, not patent or copyright misuse

---

4. Of course, if there is only one market for parts and service, Xerox has a much stronger argument that it may exclude competitors for service without improperly expanding the scope of its patent protection.

5. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

immunity. As noted before, a party's actions may rise to the level of patent or copyright misuse without constituting an antitrust violation. *See Zenith*, 395 U.S. at 140, 89 S.Ct. at 1585–86; *Senza–Gel*, 803 F.2d at 668. Second, CSU argues that Xerox's filing of its infringement counterclaims is only one part of its alleged scheme to exclude ISOs such as CSU from the service market. Although the filing of Xerox's infringement counterclaims alone may be insufficient to sustain a finding of misuse, CSU has presented sufficient additional evidence of an unlawful scheme to monopolize the service market to preclude summary judgment on CSU's misuse defense. *See generally W.L. Gore*, 529 F.2d at 625 (viewing both isolated acts and totality of acts before determining validity of patent misuse defense).

■ Xerox also claims that, to the extent a refusal to sell constitutes misuse, such misuse was purged by Xerox's termination of its parts policy in April of 1994 pursuant to a settlement agreement in the *R & D* litigation. *See Senza–Gel*, 803 F.2d at 668 n. 10 ("The successful patent misuse defense results in rendering the patent unenforceable until the misuse period is purged."). CSU argues that Xerox's agreement in the R & D settlement does not purge its misuse because (1) Xerox agreed only to make parts available temporarily, until the year 2000, (2) Xerox continues to charge ISOs prices that are astronomical and intentionally designed to eliminate or reduce ISO competition in the service market while Xerox charges its other customers much lower prices, and (3) Xerox continues to use its intellectual property rights over its patented products and copyrighted materials, such as pursuing its counterclaims in the instant action, as leverage to eliminate ISO competition in the service market. The court finds that CSU has presented sufficient evidence to raise issues of material fact as to whether Xerox has purged its alleged misuse. The record evidence at this point indicates at most that Xerox purged one of its alleged misuses in April 1994.[6]

6. Xerox also seeks a ruling that CSU's infringement of Xerox's patent was willful. The court need not address this issue or the validity of CSU's defenses of estoppel and laches based on

## II. Plaintiffs' Antitrust Claims.

Xerox moves for summary judgment on CSU's antitrust claims alleging that (1) CSU has not suffered antitrust injury because its alleged injury is due to Xerox's lawful refusal to sell patented parts and copyrighted software, and (2) CSU cannot prove any damage for lost profits because it cannot show that it intended to and was prepared to expand to new geographic markets.

### A. *Factual Background.*

From 1984 through 1987, CSU was a competitor of Xerox for the sale and service of Xerox copiers and printers in Kansas City, Missouri. On October 15, 1987, CSU was purchased by The Lyon Group, Inc., a venture capital investment group. CSU sought to expand its base from Kansas City. In 1988, CSU expanded to Lawrence, Kansas. On August 11, 1988, CSU decided to expand to two major cities in 1989—St. Louis as the first expansion city, followed by either Dallas/Fort Worth or Chicago. CSU began discussions with several Chicago based ISOs, but it decided to defer expansion to Chicago until 1990. In 1988, CSU also considered Indianapolis and Pittsburgh as expansion cities but ultimately rejected both cities as candidates. On October 19, 1988, CSU refined its expansion plan to include both St. Louis and Dallas in 1989 and Chicago in 1990. By the end of 1988, CSU's expansion plan was as follows:

| Calendar Year | Expansion City |
|---|---|
| 1989 | Two—St. Louis and Dallas/Fort Worth |
| 1990 | Two—Chicago plus another city |
| 1991 | Two or three cities |
| 1992 | Three or more cities |
| 1993 | Three or more cities |
| 1994 | Three or more cities |
| 1995 | Three or more cities |

On January 23, 1989, CSU opened operations in St. Louis.

With respect to Dallas, in 1988, CSU negotiated with an individual regarding opening

the court's finding above that CSU's patent misuse defense cannot be resolved as a matter of law.

an office, but the negotiations terminated because the individual's operation was not entirely copiers. In early 1989, CSU negotiated with a potential customer that had a substantial volume of previously leased high volume Xerox copiers in Dallas. CSU also contacted a Xerox service technician and agreed to hire the individual as a service manager for CSU's proposed office in Dallas.

On March 30, 1989, Xerox announced that it would not sell CSU parts for products restricted under Xerox's parts policy. On April 4, 1989, Xerox cancelled CSU's subscriptions to service manuals. Shortly thereafter, CSU abandoned its plans to expand to Dallas. CSU did not expand to any other domestic markets until 1994.

In May 1994, as the result of a settlement of a class action brought by a number of ISOs (CSU opted out of the settlement of that action) against Xerox, Xerox agreed to begin selling parts once again to ISOs, including CSU. CSU expanded to three cities in 1994, four cities in 1995, and one in 1997.

CSU contends that Xerox's parts policy thwarted or delayed its efforts to expand to a number of cities between 1989 and 1995. The following is a summary of CSU's damage calculations:

| City | Estimated Expansion Date | Actual Expansion Date |
|------|--------------------------|------------------------|
| Chicago | Oct. 1990 | None |
| Milwaukee | Apr. 1993 | None |
| Minneapolis | Oct. 1993 | None |
| Louisville | Apr. 1994 | None |
| Memphis | Aug. 1994 | None |
| Cincinnati | Dec. 1994 | None |
| Nashville | Aug. 1995 | None |
| Charlotte | Dec. 1995 | None |
| Dallas | Oct. 1989 | June 1994 |
| Wichita | Apr. 1990 | Oct. 1994 |
| Houston | Oct. 1991 | Dec. 1994 |
| Oklahoma City | Apr. 1991 | Apr. 1995 |
| Atlanta | Apr. 1995 | Nov. 1995 |
| Austin | Apr. 1992 | Dec. 1995 |
| San Antonio | Aug. 1992 | Dec. 1995 |
| Denver | Dec. 1992 | Feb. 1997 |

### B. *A Refusal To Sell Patented Parts And Copyrighted Software May Give Rise To An Antitrust Violation.*

■ Xerox first contends that CSU has not suffered antitrust injury because its alleged injury is attributable to Xerox's lawful refusal to sell patented parts and copyrighted software. The court essentially has addressed this argument above with respect to CSU's patent misuse affirmative defense. The court incorporates that discussion by reference here.

### C. *Antitrust Liability Based On Pricing Of Parts.*

■ Xerox seeks partial summary judgment on CSU's claim for antitrust damages arising from Xerox's alleged use of parts overcharges as an exclusionary device. Xerox contends that it has the right to charge as high a price as it sees fit. This argument is closely related to Xerox's argument that it can refuse to license a patented or copyrighted work because a patent or copyright holder could set the license fee so high that the fee effectively amounts to a refusal to sell. The court therefore incorporates by reference its discussion above of CSU's patent misuse affirmative defense.

Again, Xerox is correct that as a general principle "[a] natural monopolist that acquired and maintained its monopoly *without excluding competitors by improper means* is not guilty of 'monopolizing' in violation of the Sherman Act, and can therefore charge any price it wants." *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir.1995) (emphasis added, citations omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 233 (1996). Pricing strategies, however, can be subject to antitrust scrutiny in certain circumstances. For example, in *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), Kodak unsuccessfully attempted to purchase plaintiff's business which competed with various Kodak-owned dealers in the same geographic area. *Id.* at 368–69, 47 S.Ct. at 401–02. Kodak then refused to sell its goods to plaintiff at a dealers' discount and instead charged plaintiff the retail prices at which the goods were sold by other Kodak-owned dealers. The Court held that the issue of whether Kodak's pricing of goods was in furtherance of a purpose to monopolize was

properly submitted to the jury. *Id.* at 375, 47 S.Ct. at 404.

■ In addition, Xerox's alleged discriminatory pricing pattern against ISOs alone may be sufficient to support an antitrust violation. *See Peelers Co. v. Wendt,* 260 F.Supp. 193 (W.D.Wash.1966). In *Peelers,* the court found that

> [f]ood packers who are required by a patentee owner of processing machinery to pay substantially higher lease rates for use of such machinery than are paid for the use of identical machinery by their competitors selling food processed by the machinery in the same relevant market, necessarily have greater expense for machinery rental than their competitors and in that particular the ability of the disfavored food packer lessees to compete in the relevant market may be diminished.

*Id.* at 197.

Xerox cannot single out the pricing of its parts to CSU from CSU's other antitrust allegations. Rather, Xerox's pricing scheme must be viewed in light of all of CSU's allegations of Xerox's anticompetitive conduct and attempt to monopolize the copier and printer service markets. Xerox, for the most part, has ignored CSU's contention that Xerox has used the price of its patented parts and copyrighted software as a weapon to acquire and/or maintain a monopoly over service. Xerox simply responds that it has an absolute right to price its products as it sees fit. On the other hand, CSU argues that Xerox's pricing policy in effect amounted to a refusal to sell, which is illegal when the refusal is used to expand a monopoly from one market to another. CSU also alleges that Xerox charged ISOs significantly higher prices for parts than other customers in an attempt to eliminate ISO competition in the service market. Finally, CSU alleges that the actual licensing agreements entered into by Xerox excluded many competitors (ISOs) in the service market. CSU has presented sufficient evidence on all these points to preclude summary judgment in favor of Xerox.

**D. *Proof That CSU Intended To And Was Prepared To Expand To New Markets.***

■ Xerox also moves for summary judgment on CSU's antitrust claims arguing that CSU has failed to establish standing to bring its claims. In particular, Xerox contends that CSU cannot prove that it intended to and was prepared to expand to new geographic markets, an essential element of plaintiff's case for lost profits.

CSU claims that Xerox's anticompetitive conduct thwarted expansion of its business to a number of metropolitan areas in the United States. To establish damages for lost profits from these other geographic markets, CSU must establish that it both intended to and was prepared to expand its business. *See Great Western Directories, Inc. v. Southwestern Bell Tel. Co.,* 63 F.3d 1378, 1389 (5th Cir.1995), *superseded in part on other grounds,* 74 F.3d 613 (5th Cir.1996); *Curtis v. Campbell–Taggart, Inc.,* 687 F.2d 336, 338 (10th Cir.), *cert. denied,* 459 U.S. 1090, 103 S.Ct. 576, 74 L.Ed.2d 937 (1982); *Martin v. Phillips Petro. Co.,* 365 F.2d 629, 633 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966). The "intent and preparedness" test was "designed to permit excluded competitors to challenge their exclusion [from a market] without being first required needlessly to incur economic harm." *Fleer Corp. v. Topps Chewing Gum, Inc.,* 501 F.Supp. 485, 504 (E.D.Pa. 1980), *rev'd on other grounds,* 658 F.2d 139 (3d Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982). The Tenth Circuit has identified four factors to consider in determining plaintiff's intention and preparedness to enter a new market: (1) plaintiff's background and experience in the proposed business, (2) affirmative action on plaintiff's part to engage in the proposed business, (3) ability to finance the business and purchase the necessary equipment and facilities, and (4) consummation of contracts. *Curtis,* 687 F.2d at 338; *see Martin,* 365 F.2d at 633–34.

The court must determine first whether standing (or injury-in-fact) is analyzed with respect to each geographic market or with

respect to all geographic markets combined.[7] In most cases discussing the antitrust standing issue, the defendant's alleged exclusionary conduct is related to a specific product or geographic market. For example, in the Supreme Court case of *Zenith*, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), the Court analyzed the standing issue separately for three geographic markets, apparently because there was different alleged exclusionary conduct (patent pools in that case) in each of the various markets. Here, CSU does not claim that Xerox's conduct in a specific geographic market prevented expansion. Rather, CSU alleges that Xerox's conduct prevented all domestic expansion of its business. Xerox's alleged conduct is the same for each geographic market. In these circumstances, the appropriate inquiry for purposes of standing is whether CSU intended to and was prepared to expand its domestic operation. The precise number of cities CSU would have expanded to and the profits for each city are questions of the amount of damages, not the fact of injury.

CSU's burden to establish compensable injury under the antitrust laws "is satisfied by its proof of some damage flowing from [defendant's actions]; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith*, 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9. CSU must establish only that the illegality is "a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4." *Id.*

CSU certainly has presented sufficient evidence that it intended to and was prepared to expand to a number of domestic markets from 1989 through 1995. CSU had adequate background and experience in the copier and printer service business to support expansion into new geographic markets. In addition, there is record evidence that plaintiff had the ability to finance expansion of its business into other geographic markets. Further, CSU has presented evidence of its expansion plans before Xerox's alleged anticompetitive conduct and CSU's record of expansion after most of Xerox's conduct ended. On the other hand, CSU has presented very little evidence of affirmative steps it took or contracts it consummated for a number of specific geographic markets.

Although CSU has been rather inarticulate in stating its damage theory, the court concludes that CSU, in effect, is arguing that Xerox's alleged conduct precluded CSU from further expansion within the domestic copier and printer service market. Under this theory, CSU need only show that it intended to and was prepared to expand its business in the domestic market, but was precluded from doing so because of Xerox's conduct. Although at this point the court has some concerns regarding CSU's evidence and theory of lost profits,[8] the court finds that there is sufficient evidence for a jury to infer that CSU intended to and was prepared to ex-

---

7. In resolving the standing issue, some courts have drawn the distinction between "expansion of a present business into a new market" and "growth in an ongoing business." *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 986 (5th Cir.1977), .cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). "The line to be drawn between expansion into new areas and growth in established ones is not easily defined and one that must be determined from the facts of each case." *Id.* Even if the court applied this standard and accepted Xerox's contention that CSU is truly expanding into a "new" area, the court still must address whether the "new" area is all domestic expansion or expansion into 16 different geographic areas.

8. For example, CSU has presented no direct evidence that it intended to enter the Charlotte, Louisville, Memphis, and Nashville markets. CSU took no affirmative steps towards expansion into these markets and has not yet expanded to any of these cities. According to CSU's damage calculation, CSU projected to expand to Louisville in April 1994, Memphis in August 1994, Atlanta in April 1995, Nashville in August 1995, and Charlotte in December 1995. CSU claims that it considered Charlotte, Louisville, Memphis, and Nashville as expansion candidates (as "spoke" cities) from its Atlanta hub office. CSU actually expanded to Atlanta in October 1995 but it has not expanded to any of the other four cities. CSU's actual practice of expansion appears to be inconsistent with its projected expansion dates for each market and CSU's "hub and spoke" theory of expansion.

pand its business in the domestic market by opening new locations in various cities. *See Zenith*, 395 U.S. at 114–25, 89 S.Ct. at 1571–78 (where defendant was an established organization with a long history of successfully excluding competitors, "the injury alleged by *Zenith* was precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause. The trial court was entitled to infer from this circumstantial evidence that the necessary causal relation between the [defendant's] conduct and the claimed damage existed."); *Neumann v. Vidal*, 710 F.2d 856, 858–60 (D.C.Cir.1983) (factors relating to plaintiff's intention and preparedness to enter the market should have been submitted to the jury); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1051 (9th Cir. 1981) (jury may infer that plaintiff's antitrust injury was caused by defendant), *cert. denied*, 459 U.S. 825, 825, 103 S.Ct. 57, 58, 74 L.Ed.2d 61 (1982); *Cable Holdings of Georgia, Inc. v. Home Video, Inc.*, 572 F.Supp. 482, 491–92 (N.D.Ga.1983) (whether plaintiff was prepared to expand to a new geographic market is a jury issue).

CSU requests the jury to infer that expansion to the various metropolitan areas would have been consistent with its corporate philosophy and historical expansion efforts both before and after Xerox's alleged anticompetitive conduct. Although the actual names of a number of the cities may be speculative, the fact of injury is reasonably certain. CSU has presented evidence that Xerox specifically sought to exclude CSU from the entire domestic copier and printer service market by Xerox's enforcement of its parts policy, along with other related conduct. This evidence strongly suggests that CSU indeed has suffered some injury as a result of Xerox's alleged conduct. *See D & S Redi–Mix v. Sierra Redi–Mix & Contracting Co.*, 692 F.2d 1245, 1249 (9th Cir.1982) ("Where, as here, defendants have acted with intent to eliminate competition, the proof of resulting injury need not be overwhelming."). Xerox's stated goal to capture 100% of the service

market by eliminating ISOs is precisely the injury CSU alleges in this case.

Xerox claims that CSU's decision not to enter the various markets may have been motivated by a number of other factors unrelated to Xerox's conduct (such as the availability of competent management employees and the presence of other ISOs in the geographic market) and thus Xerox's conduct cannot be the proximate cause of CSU's injuries. CSU has presented sufficient evidence to preclude summary judgment on this issue. Although there may have been several factors which impacted CSU's decision to expand, it is for a jury to determine if Xerox's conduct was the proximate cause of CSU's failure or delay in expanding to new markets. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 566, 51 S.Ct. 248, 251–52, 75 L.Ed. 544 (1931).

Many of Xerox's arguments as to CSU's expansion plans to particular geographic markets are more properly raised at trial as to the proximate cause and amount of CSU's damages, not the fact of injury. CSU certainly has presented sufficient evidence at this point as to the amount of damages to preclude summary judgment. "There is a clear distinction between the measure of proof necessary to establish the fact that [plaintiff has] sustained some damage and the measure of proof necessary to enable the jury to fix the amount." *Story*, 282 U.S. at 562, 51 S.Ct. at 250; *see Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579–80, 90 L.Ed. 652 (1946). In addition, the Supreme Court repeatedly has accepted a lesser degree of certainty as to the amount of damages in antitrust cases because of the uncertainties of the marketplace compared to other types of injuries such as property damage or personal injuries. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981); *Zenith*, 395 U.S. at 123, 89 S.Ct. at 1576–77. This rule is based primarily on the principle that a wrongdoer should not be able to insist that the amount of damages be measured with exactness and precision when he is responsible for the damages. *J. Truett*, 451 U.S. at

566–67, 101 S.Ct. at 1929–30; *Bigelow*, 327 U.S. at 264, 66 S.Ct. at 579–80; *Story*, 282 U.S. at 563, 51 S.Ct. at 250–51. "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 264, 66 S.Ct. at 579–80. Although a jury cannot rely on pure speculation and guesswork in determining the amount of damages, a jury is allowed to act upon probabilities and inferences as well as direct proof. *See Story*, 282 U.S. at 564, 51 S.Ct. at 251 (citation omitted). "It will be enough if the evidence show[s] the extent of damages as a matter of just and reasonable inference, although the result be only approximate." *Id.* at 563, 51 S.Ct. at 250–51.

A jury could infer from the record evidence that CSU would have expanded to a city of the size and profit potential as the cities identified in CSU's damage calculation. CSU has presented evidence of its expansion plan in 1989, its corporate philosophy regarding expansion, and its record of expansion both before and after Xerox enforced its parts policies. The Supreme Court has held that such before and after evidence of receipts and profits is a sufficient basis for a jury's computation of damages, particularly where the defendant's wrongful action prevented any more precise proof of damages. *See Bigelow*, 327 U.S. at 266, 66 S.Ct. at 580–81; *Eastman Kodak*, 273 U.S. at 376–77, 47 S.Ct. at 404–05; *Independence Tube Corp. v. Copperweld Corp.*, 691 F.2d 310, 330 (7th Cir.1982), *rev'd on other grounds*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); *Heatransfer*, 553 F.2d at 986. Although CSU's claim of lost profits rests on several assumptions, resolution of the reasonableness of the assumptions underlying a plaintiff's damage theory is the traditional responsibility of the jury. *See Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir.1974), *cert. denied*, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 566–67 (2d Cir.1970). CSU has presented sufficient evidence in support of its assumptions, which form the basis of its lost profits claim to preclude summary judgment.

### E. *CSU's Losses Attributable To Exdos.*

In May 1991, CSU purchased Exdos in part to take advantage of an order of the Canadian Competition Tribunal requiring Xerox Canada to sell parts to Exdos. CSU contends that Xerox's enforcement of its parts policy forced CSU to acquire Exdos in an attempt to secure a reliable parts source. CSU lost approximately $1,000,000 through its operation of Exdos. CSU sold Exdos in 1995.

Xerox contends that CSU cannot prove as a matter of law that Xerox's conduct caused Exdos' losses. CSU concedes that Exdos had managerial and operating weaknesses which may have contributed to Exdos' losses. Yet, CSU claims that it never would have been exposed to those managerial and operating weaknesses but for Xerox's failure to make parts available in the United States. CSU's chain of causation is somewhat attenuated and does seem to mix inappropriately the concepts of a "but for" cause and a proximate cause. Despite these concerns, the court finds that CSU has presented sufficient evidence at this stage for a jury to conclude that Xerox's conduct was the proximate cause of at least some of Exdos' losses.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment on its willful patent infringement counterclaims (Doc. # 362) is denied.

IT IS FURTHER ORDERED that defendant's motion for summary judgment on plaintiffs' antitrust claims (Doc. # 410) is denied.