**MILLER PIPELINE CORPORATION,**
Plaintiff,

v.

**BRITISH GAS PLC, Defendant.**

**No. IP 94–1421–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 27, 1999.

Donald Knebel, Barnes & Thornburg, Indianapolis, IN, for plaintiff.

Edward W. Harris, Sommer & Barnard, Indianapolis, IN, Marvin Petry, Larson & Taylor, Alexandria, VA, for defendant.

### *ENTRY GRANTING DEFENDANT'S* [1] *MOTION FOR PARTIAL SUMMARY JUDGMENT*

BARKER, Chief Judge.

This matter comes before the Court on Defendant's motion for partial summary judgment as to Plaintiff's claim that Defendant violated § 2 of the Sherman Act, 15 U.S.C. § 2 in asserting its patents against Plaintiff for anticompetitive purposes. Defendant contends that Plaintiff's antitrust claim must fail because Defendant's assertion of its patents was not objectively baseless and thus Defendant is immune from antitrust liability. Plaintiff argues that antitrust immunity is not available in this case because (1) Defendant perpetrated fraud on the patent office in prosecuting its patents, (2) Defendant asserted its patents against Plaintiff in bad faith and (3) Defendant's patent infringement claims were objectively baseless and motivated by an anticompetitive purpose. In addition to their submissions with respect to the cur-

---

1. We were informed after this decision was handed down, but before publication, that "in connection with a corporate reorganization during the pendency of this litigation, its name was changed to BG plc and the right to use the name British Gas plc was assigned to another entity."

rent motion, the parties incorporate their briefs and supporting evidence from Defendant's prior motion for partial summary judgment that Miller Pipeline infringes Defendant's patents. For the reasons set forth below, we *grant* Defendant's motion.

## STATEMENT OF MATERIAL FACTS[2]

Plaintiff, Miller Pipeline Corporation ("Miller Pipeline"), is an Ohio corporation, having a principal place of business in Indianapolis, Indiana. Compl. ¶ 1. Defendant, British Gas PLC ("British Gas"), is a corporation duly organized and existing under the laws of England and Wales, having a principal place of business at Rivermill House, 152 Grosvenor Road, London, SW1V 3JL, England. Compl. ¶ 2. British Gas is the successor to British Gas Corporation, a government corporation that was dissolved in 1990. *See id.* Miller Pipeline and British Gas are competitors in the business of trenchless repair of underground pipes. Plaint. Resp.Br. at 2. The relevant market at issue in this litigation is the licensing, promotion and sale of products and services for trenchless pipe repair. *Id.*

British Gas owns U.S.Patent No. 4,738,-565 (the " '565 patent"), entitled "Method of Replacing Mains," granted on April 19, 1988, and U.S.Patent No. 4,720,211 (the " '211 patent"), entitled "Apparatus for Replacing Mains," granted on January 19, 1988. *See* Compl. ¶ 13; Def. Summary of Statement of Material Facts, Def. Prior Mot.Summ.Judg. ("SSMF") at 1. The '565 method patent and the '211 apparatus patent disclose methods and apparatus for replacing crackable existing pipes with new pipe wherein the existing pipe is fractured into irregular fragments and the new pipe is moved into a clearance through the fractured pipe. The patents describe the use of a mole device to crack and expand the fragments of crackable

existing pipe. Def. SSMF at 4–5. For purposes of its prior summary judgment motion on infringement, British Gas listed 4 exemplary claims, 2 from each patent. Claim 45 of the '565 patent describes:

45. A method for replacing an existing main with a new main, comprising the steps of:

A. starting with an existing main which is of a rigid material which cracks and is thus fracturable into irregular fragments,

B. moving a tool through the existing main which engages the internal wall thereof as it moves through the main, to apply an intense local pressure to the existing main to crack and fracture it into irregular fragments as the tool moves therethrough,

C. spreading the fragments outwardly generally about the axis of the tool to form a sufficient clearance through the fractured main for movement therethrough of an assembly for replacing the existing main, at least a portion of the outward movement of the fragments occurring under the action of said intense local pressure which causes the fracturing of the existing main into irregular fragments.

Def. Prior Summ.Judg.Mot.Br. at 2–3. Claim 9 of the '565 patent describes:

9. A method for replacing an existing main which is of crackable, fracturable material with a new main using a mole having a front end which tapers radially inwardly towards the front of the mole and has a fracturing surface for engagement with the internal wall of the existing main, said fracturing surface comprising blades on the front end radially openable and retractable in relation to the axis of the taper surface, the method comprising

---

**2.** The facts in this case are quite extensive, as the parties have been litigating since 1994 on very complex legal and factual issues. However, this motion addresses only Miller Pipeline's antitrust claim under the Sherman Act and so we will address facts relating to the patent infringement claims and defenses only to the extent necessary to establish a proper background for this case and when such facts are relevant to the issue directly before the Court today.

A. attaching to the rear end of the mole a tubular replacement assembly,

B. inserting the mole into the existing main with the front end of the mole leading and moving the mole along the existing main so that the front end of the mole engages internally with the existing main and

C. sequentially opening and retracting the blades to engage and fracture the wall of the existing main ahead of the assembly with the said blades exerting an intense local pressure to crack and fracture the material of the existing main into irregular fragments,

D. spreading the fragments outwardly generally about the axis of the mole to form a sufficient clearance through the fractured main for movement of the assembly thereamong,

E. at least a portion of the outward spreading of the fragments occurring under the action of the blades essentially concurrently with the fracturing of the existing main into such fragments.

Def. Prior Summ.Judg.Mot.Br. at 3. Claim 31 of the '211 patent describes:

31. An apparatus for replacing an existing main which is of a rigid material which cracks and is fracturable into irregular fragments, said apparatus comprising:

A. an elongated pipe fracturing an displacement tool, (i) said tool having a fracturing means for applying an intense local pressure against the internal wall of the existing main to crack and fracture the existing main into irregular fragments, said fracturing means being operable to cause at least some outward movement of the fragments under the action of said intense local pressure which causes the fracturing of the main into irregular fragments, and said tool further having (ii) an expansion means for moving the irregular fragments radially outwardly generally about the axis of the main to enlarge the clearance through the fractured existing main for the passage therethrough of an assembly for replacing the existing main, and

B. means for moving the tool through the existing clearance.

Def. Prior Summ.Judg.Mot.Br. at 3–4. Claim 22 of the '211 patent describes:

22. A device for replacing an existing buried fracturable main of a crackable fracturable material with a tubular replacement assembly, the device comprising:

A. an elongated main fracturing and bore widening mole for insertion into and movement along the existing main, the mole having

(i) a rearwardly, outwardly tapering bore widening potion having a small extremity not greater than the internal diameter of the buried fracturable main and a large extremity greater than the internal diameter of the buried fracturable main, to provide bore widening, and the mole being provided with

(ii) a fracturing means for applying an intense local pressure against the existing main to crack and fracture it into irregular fragments, said fracturing means comprising at least one retractable outwardly movable main fracturing member which is so positioned on the mole to engage the internal wall of the fracturable main to crack and fracture the buried fracturable main to debris in the form of irregular fragments and causing at least some outward movement of said fragments, said large extremity comprising an expansion means for forcing the fragments radially outwardly from the axis of the existing main, generally about said axis to form a passage,

B. means for connecting the trailing end of the mole to a leading end of the assembly, whereby in use the new main or liner is moved linearly through the passage so formed, and

C. means for moving the mole through the buried fracturable main.

Def. Prior Summ.Judg.Mot.Br. at 4.

British Gas has been attempting to enforce its patents against allegedly infring-

ing devices by Miller Pipeline for many years, specifically products marketed under the name "XPANDIT" and including, among other things, a mole incorporating the invention disclosed in U.S.Patent No. 4,789,268 (the " '268 patent" or the "Yarnell mole"), a patent owned by Miller Pipeline and issued December 6, 1988. See Plaint. Resp.Br. at 3; Compl. ¶¶ 62–63. In June 1989, British Gas and its former exclusive licensee, PIM Corporation ("PIM"), first contacted Miller Pipeline and threatened to bring suit against Miller Pipeline for patent infringement based on its XPANDIT products and the Yarnell mole. *Id.;* Plaint. Exh. 1, Topf Aff. ¶ 8. In August 1990, the parties met in Fredericksburg Virginia at a job site on which Miller Pipeline was using the Yarnell mole and other products to perform a trenchless operation in order that British Gas could witness the products in use. *See* Plaint. Resp.Br. at 3; Topf Aff. ¶ 10. The parties did not reach any resolution at this meeting or any other subsequent time. In late 1989 through at least 1994, British Gas also contacted several of Miller Pipeline's customers to inform them that it was British Gas' position that it may be entitled to royalties for the use of the XPANDIT system in view of its '565 patent. *See* Plaint. Exh. 2, letter to Costa Rica Sanitary District; Exh. 4, letter to Mountain Cascade Inc. However, British Gas did not file suit against Miller Pipeline at this time. British Gas also pursued similar claims against TT Technologies, Inc. ("TTT") and Trenchless Replacement Systems, Inc. ("TRS"), threatening these companies with patent infringement litigation but not bringing suit. *See* Plaint. Resp. Br. at 4. Both TTT and TRS filed declaratory judgment actions against British Gas, at which point British Gas counterclaimed with its infringement claims, and the cases ultimately settled before trial. *See id.*

On September 23, 1994, Miller Pipeline sued British Gas for antitrust violations under § 2 of the Sherman Act, contending that British Gas asserted its patents against Miller Pipeline and certain of Miller Pipeline's customers in order to absorb all or most of the market in trenchless underground pipe repair and with the knowledge that such patents were invalid and unenforceable. Miller Pipeline contends that "British Gas has used two (invalid) patents against its competitors. For ten years, British Gas has threatened and coerced its competitors, and British Gas has done so in such a way as to avoid adjudication on the issues of validity and infringement." Plaint. Resp.Br. at 6. Miller Pipeline also asserted a patent infringement claim based on its '268 patent against British Gas. British Gas subsequently filed an infringement action against Miller Pipeline in the District of New Jersey on February 10, 1995 but did not serve Miller Pipeline immediately, instead seeking to negotiate a settlement agreement. See id. at 5. When its settlement attempts proved unsuccessful, British Gas served Miller Pipeline with the complaint, and the action was dismissed by the District of New Jersey in deference to the pending litigation in this case. *See id.* British Gas filed a counterclaim for patent infringement in the present litigation and also filed a Request for Reexamination with the United States Patent and Trademark Office of Miller Pipeline's '268 patent. Upon reexamination, the patentability of the '268 patent was confirmed, with amendments to some of the claims. *See id.* at 5–6.

British Gas moves for partial summary judgment on Miller Pipeline's antitrust claim, asserting that its patents are valid and enforceable and that in any event British Gas has a colorable claim for infringement by Miller Pipeline and that all that is required for immunity against antitrust claims is a reasonable belief that its patents are valid and infringed under the *Noerr–Pennington* "sham litigation" doctrine. Further, British Gas asserts that Miller Pipeline has produced no evidence indicating that British Gas subjectively intended an anticompetitive effect by its conduct in attempting to enforce its patents. Thus, British Gas claims it is immune from liability for any alleged antitrust violation under the Sherman Act.

Miller Pipeline responds that British Gas' attempts to enforce its patents were objectively baseless and subjectively motivated to produce an anticompetitive effect. Miller Pipeline also contends that there is more than one theory supporting its antitrust claims. In addition to the theory relied upon by British Gas, the *Noerr–Pennington* "sham litigation" doctrine, Miller Pipeline argues that it can prove that British Gas violated antitrust laws by showing that (1) British Gas obtained its patents through fraud on the patent office or (2) British Gas asserted its patents in "bad faith." British Gas asserts that Miller Pipeline has raised the theory of fraud on the patent office for the first time in this litigation in its response brief and that Miller Pipeline did not plead fraud with particularity in its complaint as required by Federal Rule of Civil Procedure 9(b). In addition, British Gas contends that there is no generic "bad faith" theory for antitrust liability for asserting patent rights and that the only recognized theories are fraud in the prosecution of the patent or "sham litigation."

## SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist Med. Center v. American Med. Sec., Inc.,* 38 F.3d 316, 319 (7th Cir.1994). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Greenslade v. Chicago Sun–Times, Inc.,* 112 F.3d 853, 857 (7th Cir.1997).

Moreover, "in rendering a decision on a motion for summary judgment, a court must 'view the evidence presented through the prism of the substantive evidentiary burden' that would inhere at trial." *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 880–881 (Fed.Cir. 1998) (quoting *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513). In considering a summary judgment motion, a court must draw all justifiable inferences in a light most favorable to the opposing party and must resolve any doubt against the moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513; *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992).

While the burden rests squarely on the party moving for summary judgment to show "that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), the nonmoving party may not simply rest on the pleadings, but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Billups v. Methodist Hosp. of Chicago,* 922 F.2d 1300, 1302 (7th Cir.1991). Conclusory allegations by a party opposing a motion for summary judgment cannot defeat the motion. *See Smith v. Shawnee Library System,* 60 F.3d 317, 320 (7th Cir.1995). "The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. However, if doubts remain as to the existence of a material fact, those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *See Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989).

## DISCUSSION

First we will address the issue of fraud on the patent office. We agree with

British Gas that Miller Pipeline does not appear to have raised this theory previously, certainly not in their pleadings. Averments of fraud on the patent office must satisfy Rule 9(b)'s requirement that fraud be pled with particularity. *See Xilinx Inc. v. Altera Corp.*, 33 U.S.P.Q.2d 1149, 1150, 1994 WL 782236 (N.D.Cal.1994); *Sun– Flex Co. Inc. v. Softview Computer Prods. Corp.*, 750 F.Supp. 962, 18 U.S.P.Q.2d 1171, 1172 (N.D.Ill.1990); *Micro Motion, Inc. v. Exac Corp.*, 112 F.R.D. 2, 3 (N.D.Cal.1985). Because Miller Pipeline has not alleged in its complaint that British Gas committed fraud on the patent office, it follows necessarily that Miller Pipeline has not pled fraud with particularity. However, in order to prevent merely delaying this issue while Miller Pipeline amends its complaint to add its fraud on the patent office allegation and because we find that we can decide the issue based on the evidence before the Court, we will address the merits of Miller Pipeline's fraudulent patent prosecution theory at this time.

■ The Supreme Court in *Walker Process* determined that antitrust liability under § 2 of the Sherman Act applies to the enforcement and maintenance of a patent obtained by fraud on the Patent and Trademark Office. *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.*, 382 U.S. 172, 174, 86 S.Ct. 347, 349, 15 L.Ed.2d 247 (1965). In order to prove its claim that British Gas committed fraud on the patent office in the procurement of its patents, Miller Pipeline must show that British Gas obtained its patents by knowingly and willfully misrepresenting or omitting material facts to the patent office. *See Walker Process*, 382 U.S. at 177, 86 S.Ct. at 350. The Federal Circuit in *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed.Cir. 1998) articulated what type of evidence is required to prove fraud on the patent office under *Walker Process*. "Such a misrepresentation or omission must evidence a clear intent to deceive the examiner and thereby cause the PTO to grant an invalid patent.... A finding of *Walker Process*

fraud requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct.... [I]t must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, i.e., that the patent would not have issued but for the misrepresentation or omission." *Nobelpharma*, 141 F.3d at 1070–1071. Because patents are presumed valid and "a patentee's infringement suit is presumptively in good faith," Miller Pipeline must prove fraud on the patent office by clear and convincing evidence. *See Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*, 812 F.2d 1381, 1385 (Fed.Cir.1987), quoting *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 996 (9th Cir.1979).

■ Miller Pipeline asserts that British Gas committed fraud on the patent office in connection with its prosecution of its '565 patent, in particular its representations regarding U.S.Patent No. 3,181,302 (the "'302 patent" or the "Lindsay patent"). In procuring its '565 patent, British Gas distinguished its invention over the Lindsay patent. Miller Pipeline challenges the following representation by British Gas to the patent examiner:

Applicant's operation of applying intense local pressure to crack and fracture the material of the existing main into irregular fragments is distinguishable from a true cutting action such as in Lindsay. Technically speaking, a cutting operation as in Lindsay involves an intense local pressure. But in a true "cutting" operation, the object is to apply the force *so* locally that the surrounding area of the subject material is undisturbed. This object is quite clear during the true cutting operation as in Lindsay, wherein the cutter discs 46 slit a malleable pipe material without any intent to concurrently reposition or breakup the pipe at locations other than along the cutting line. (Of course the slit halves of Lindsay's pipe are eventually spread apart. But the spreading action is deferred until the pipe halves are subsequently engaged by spreader 20.) Another everyday example is the

cutting of a tomato. One seeks to make a cut in a tomato which is so sharp (the local pressure is *so* intense) that the knife will not disturb (mash) the portions of the tomato to either side of the cut. In contrast, the claims of the application now recite that the intense local pressure is characterized by causing cracking and fracturing into irregular elements, coupled with a disturbance of that general area sufficient for the fragments to be urged outwardly to some extent by the same intense local pressure action, and concurrently therewith." Plaint. Exh. 8, '565 patent, Paper No. 8 at 15–16 (emphasis in original). British Gas also represented "Lindsay could not be modified to cut an existing pipe 'into a multiplicity of fragments rather than two halves.'" Plaint. Exh. 9, '565 patent, Paper No. 7 at 14.

Miller Pipeline challenges the accuracy of these representations that the Lindsay patent could not be used for anything other than cutting malleable pipe. Miller Pipeline points to the fact that the Lindsay patent describes replacement of pipe "primarily due to corrosion of the pipe" (Plaint. Exh. 10, col, 1, line 12), asserting that "pipe which corrodes primarily is cast iron pipe, and contrary to British Gas' representations, the Lindsay device clearly was intended for use on cast iron pipe. Also, when pulled through cast iron pipe, the Lindsay device causes fracturing and cracking of the pipe." Plaint. Resp.Br. at 12, citing Plaint. Exh. 11, Bowles Aff. ¶¶ 7, 8. Miller Pipeline's argument rests entirely on the affidavit of David A. Bowles, who worked with William R. Lindsay, the Lindsay patent inventor, in the late 50's and through the 60's, and who observed the Lindsay patented device in operation. *See* Bowles Aff. ¶¶ 3, 5, 6. In his affidavit, Mr. Bowles testified that he considers himself "intimately familiar with the operating principles of the Lindsay apparatus due to [his] involvement in designing, building and testing the same." Bowles Aff. ¶ 5. Mr. Bowles testified that "the Lindsay apparatus as described in the patent was intended and designed to crack and fracture existing pipes made of various frangible materials, including cast iron." *Id.* at ¶ 7. He asserted that he had witnessed the Lindsay device in public demonstrations used on cast iron pipes and that the device did not sever the pipe in half but rather cracked and fractured the pipes. *See id.* at ¶ 9. Miller Pipeline provides no additional evidence in support of its fraud claim.

Even assuming that Mr. Bowles' testimony is accurate and the Lindsay device was in fact designed and used to crack and fracture cast iron pipes in a similar fashion to the '565 patent, Miller Pipeline has produced no evidence suggesting that British Gas had knowledge of this fact, much less that British Gas willfully misrepresented this fact to the patent office with the intent to deceive.[3] In addition, Miller Pipeline has produced little or no evidence showing that this alleged misrepresentation was material and that the patent office relied upon it, such that the '565 patent would not have issued but for the misrepresentation (aside from the fact that British Gas addressed the issue in the course of its patent prosecution, which we recognize indicates some measure of importance).[4] Miller Pipeline asserts, "At best, it was

---

**3.** It appears that Miller Pipeline at some point contended that the public demonstrations witnessed by Mr. Bowles constitute public use prior art, but Miller Pipeline has produced no evidence besides Mr. Bowles' own affidavit. British Gas argues that this uncorroborated evidence is insufficient, citing *Lockheed Aircraft Corp. v. United States,* 213 Ct.Cl. 395, 553 F.2d 69, 75 (1977): "Indeed, the oral testimony of witnesses, speaking only from memory in regard to past transactions has, in the absence of contemporaneous documentary or physical evidence, consistently been

found to be of little probative value.... Such uncorroborated testimony is insufficient to show anticipation, within the meaning of 35 U.S.C. § 102, of an issued patent." Miller Pipeline has not disputed this and so to the extent Miller Pipeline has advanced this argument, we consider it waived or abandoned, at least for purposes of this motion.

**4.** Although this point is ignored by Miller Pipeline, we note that the patent office had the entire text of the Lindsay patent before it during the prosecution of the '565 patent and

disingenuous for British Gas to represent that the teachings of the '302 patent are limited to the replacement of malleable pipe only. At worst, British Gas committed fraud on the patent office by making these misrepresentations." Plaint. Resp. Br. at 12. However, this statement is nothing more than sheer speculation on Miller Pipeline's part. Considering Miller Pipeline's heavy burden at trial to prove by clear and convincing evidence that British Gas perpetrated fraud on the patent office, we find that Miller Pipeline has not produced sufficient evidence on several essential elements to survive summary judgment on this claim.

Next, Miller Pipeline asserts that British Gas is liable under antitrust law for asserting its patents in "bad faith," a theory Miller Pipeline claims is distinct from the Noerr–Pennington "sham litigation" doctrine British Gas proposes. Miller Pipeline relies upon *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700 (Fed.Cir. 1992), *Kobe, Inc. v. Dempsey Pump Co.,* 198 F.2d 416 (10th Cir.1952) and *Betmar Hats, Inc. v. Young America Hats, Inc.,* 116 F.2d 956 (2d Cir.1941). These cases refer to infringement notices that were made in "bad faith" or for monopolistic purposes, lending support to Miller Pipeline's position that a showing of bad faith is sufficient for antitrust liability. *See Mallinckrodt,* 976 F.2d at 710; *Kobe,* 198 F.2d at 424–425; *Betmar Hats,* 116 F.2d at 957.

 British Gas contends that there is no generic "bad faith" theory of antitrust liability for infringement notices and threats to sue, arguing that conduct falling short of actual litigation is still covered by the *Noerr–Pennington* doctrine, which provides general immunity from antitrust

liability under the Sherman Act to persons pursuing relief through legislative action or influencing government officials, as well as administrative agencies and the courts, unless the activities merely a sham. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626, (1965); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). "Under the *Noerr–Pennington* doctrine, therefore, 'the federal antitrust laws do not regulate the conduct of private individuals in seeking anticompetitive action from the government' " or courts. *McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1558 (11th Cir.1992), quoting *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 379, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991). In order to show that an antitrust defendant's lawsuit is a sham under the *Noerr–Pennington* doctrine and thus not entitled to immunity, an antitrust plaintiff first must show that the defendant's lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail." *Professional Real Estate Investors v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 60, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611 (1993). If the lawsuit is objectively baseless, the antitrust plaintiff must show additionally that the defendant's subjective motivation was anticompetitive, such that the defendant's meritless lawsuit "conceals an attempt to interfere directly with the busi-

could have read the word "corrosion" in the text of the patent that Miller Pipeline finds so critical and could have determined independently whether the teachings of the Lindsay patent included cutting non-malleable pipe. While we recognize that prospective patentees may mislead the patent examiner, it is important to remember that British Gas disclosed the Lindsay patent and so the patent examin-

er had the opportunity to make its own determination, rather than relying exclusively on British Gas' representations. We do not need to factor this point into our analysis, primarily because Miller Pipeline has failed woefully in its evidentiary burden and because likely it is accounted for in the presumption of the validity of the patent, but we find it worthy of note.

ness relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *PREI*, 508 U.S. at 61, 113 S.Ct. at 1928 (citations omitted).

British Gas contends that its activities in notifying Miller Pipeline and its customers or competitors about potential infringement of British Gas patents and threatening to sue, although not litigation activities per se, nevertheless are covered by the *Noerr–Pennington* doctrine, and so Miller Pipeline must show that British Gas' infringement notices and threats to sue were objectively baseless and subjectively motivated by anticompetitive purposes. *See* Def.Rep.Br. at 16, citing *Glass Equipment Development, Inc. v. Besten, Inc.*, 174 F.3d 1337, 1343 (Fed.Cir.1999) (plaintiff failed to allege that defendant's "actual or threatened infringement suits were sham litigations"); *Thermos Co. v. Igloo Prods. Corp.*, 1995 WL 745832, *5 (N.D.Ill.Dec.13, 1995) ("Thermos' lawsuit and the related actions it took to protect its federally registered trademark constitute a protected activity immune from antitrust liability"); *The Consortium, Inc. v. Knoxville Int'l Energy Exposition*, 563 F.Supp. 56, 59 (E.D.Tenn.1983) ("activity to enforce federal rights, short of filing lawsuits, must also be protected if the right of access to the courts is to have significance"); *see also Pennwalt Corp. v. Zenith Laboratories, Inc.*, 472 F.Supp. 413, 424 (E.D.Mich. 1979) (granting *Noerr–Pennington* immunity to both lawsuits and threats of lawsuits). In addition, British Gas attempts to distinguish the cases cited by Miller Pipeline in support of its theory that mere "bad faith" is enough to impose antitrust liability by asserting that such cases either dealt with issues other than antitrust law or were decided before *PREI*, 508 U.S. at 60–61, 113 S.Ct. at 1928, in which the Supreme Court reaffirmed the extension of *Noerr–Pennington* antitrust immunity to judicial proceedings and specifically in the intellectual property context.

■ We believe that extension of the "sham litigation" doctrine to activities that fall short of litigation but which manifest the patentholder's intent to protect its rights through judicial action, if necessary, is the more logical and practical rule and is consistent with the public interest in protecting access to the courts, a right derived at least in part from the First Amendment. Although the Seventh Circuit has not addressed this issue, we note that several circuit courts deciding this issue have found the *Noerr–Pennington* doctrine applicable to pre-litigation activities such as infringement notice letters and threats to sue, and we find this precedent persuasive. *See Cardtoons v. Major League Baseball Players Assoc.*, 182 F.3d 1132, 1136 (10th Cir.1999); *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558–1560 (11th Cir.1992); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850–851 (1st Cir. 1985); *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir.1983); *see also Glass Equipment Development Inc. v. Besten*, 174 F.3d 1337, 1343 (Fed. Cir.1999) (stating that plaintiff failed to allege that defendant's "actual or threatened infringement suits were sham litigations," suggesting that threats to sue are covered by *Noerr–Pennington* ). As the Fifth Circuit stated in *Coastal States Marketing*, "Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." 694 F.2d at 1367. Particularly because the patentholder's competitors who receive infringement notices and threats to sue have available to them the vehicle of a declaratory judgment action under 28 U.S.C. § 2201 to challenge the patentholder's assertions of infringement,[5] we find that the

---

**5.** *See, e.g., Kaplan v. Helenhart Novelty Corp.*, 182 F.2d 311, 314 (2d Cir.1950): "[T]he only

sham litigation doctrine protects pre-litigation infringement notices and threats to sue. British Gas' activities about which Miller Pipeline complains in this case fall within this category and accordingly we will evaluate them under *Noerr–Pennington* and *PREI*, 508 U.S. at 60–61, 113 S.Ct. at 1928.

However, we note that choosing between Miller Pipeline's and British Gas' proposed standards is somewhat unnecessary, as there appears to be little meaningful difference between them. Under the "bad faith" standard offered by Miller Pipeline, even if British Gas were incorrect as to the nature and scope of its patent rights, it would be absolved from liability as long as it had a good faith belief in its patent rights. *See Mikohn*, 165 F.3d at 897. In other words, if the information contained within the notices was inaccurate but British Gas honestly and reasonably believed it to be true, it would not be subject to liability, while as long as the information was correct, even if British Gas had an anticompetitive motive for providing infringement notices, the notices would be legal. This standard is not unlike the objectively baseless and subjective anticompetitive intent standard of the *Noerr–Pennington* doctrine proposed by British Gas. Under both standards, any anticompetitive motive by British Gas is irrelevant as long as its patents are valid and infringed or British Gas had a reasonable belief in the validity and infringement of its patents. However, we will use the standards set forth in *Noerr–Pennington* and its progeny to decide whether British Gas is entitled to antitrust immunity for its litigation-related activities. Because there is no dispute that the *Noerr–Pennington* doctrine applies to British Gas' infringement counterclaims in the present action and British Gas' pre-litigation activities are predicated on the same patents and claims

as the counterclaim, we will consider all of British Gas' patent enforcement activities together in the same analysis.

■■■■ Turning to the merits, we first must examine Miller Pipeline's allegations of anticompetitive conduct by British Gas. Miller Pipeline asserts that British Gas acted in restraint of trade by (1) repeatedly notifying Miller Pipeline, its customers and its competitors of its patents, (2) repeatedly threatening to sue for patent infringement without intending to sue and (3) bringing objectively baseless counterclaims in bad faith against Miller Pipeline in this lawsuit. Miller Pipeline asserts that these activities constitute an attempt by British Gas to monopolize the market in the promotion and sales of products and services related to trenchless repair and replacement of utility pipes in the United States. As discussed above, British Gas' subjective intent is irrelevant provided it had a reasonable belief in the validity and infringement of its patent rights. Thus, our inquiry must focus first on the objective merits of British Gas' infringement claims to determine whether British Gas had probable sue to sue or threaten to sue Miller Pipeline for infringement. We must determine whether Miller Pipeline has shown that there is a genuine issue of material fact that British Gas' claims were objectively baseless. In addition, we recognize that, "[a]s patents are cloaked in a presumption of validity, a patent infringement suit is presumed to be brought in good faith," *Atari Games Corp. v. Nintendo of America*, 897 F.2d 1572, 1577 (Fed. Cir.1990), and "this presumption can be rebutted only by clear and convincing evidence," *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*, 812 F.2d 1381, 1385 (Fed.Cir.1987).

Miller Pipeline argues as follows: "Miller [Pipeline] concedes that the British Gas

<hr>

evidence of bad faith is the defendants' failure to sue promptly. But the plaintiffs have continuously had a plain and complete remedy for any wrong done them, in that they could have brought this suit whenever they pleased after the first notice was given, instead of

waiting as they did.... Any delay in putting the defendants' asserted rights to the test of actual litigation was, therefore, only what the plaintiffs chose to permit.... [T]he suit is as timely as they chose to make it."

patents a re facially valid and are susceptible to a valid claim interpretation. However, under a valid claim interpretation, Miller's devices do not infringe." Plaint. Resp.Br. At 19. Miller Pipeline claims that:

in order to be valid over the prior art, British Gas' claims must be interpreted more narrowly than British Gas has asserted, and such a narrow interpretation necessarily means that Miller does not infringe. If the claims are given the broad interpretation asserted by British Gas, then British Gas' patent claims are invalid due to the prior art. Either Miller does not infringe or British Gas' claims are invalid. British Gas cannot have it both ways. Given that there is no construction which renders the British Gas patents valid and infringed, there is no objective basis for British Gas' infringement counterclaims.

*Id.* (citations omitted). As an example, Miller Pipeline focuses the Court's attention on the "intense local pressure" claim language in British Gas' '565 patent. Miller Pipeline contends that the prosecution history of the '565 patent reveals that "intense local pressure" was made distinct from "cutting" to allow the '565 patent to be patentable over the prior art, the Lindsay '302 patent. Miller Pipeline argues further that "[t]his distinction was necessary for patentability, since the prior art Lindsay device cuts the pipe with a series of rollers. Thus, in order to be patentable over the prior art, the 'intense local pressure' of the '565 patent cannot include cutting with rollers." Plaint. Resp.Br. At 20. Miller Pipeline contends that each of its challenged devices contains such rollers and so cannot infringe British Gas' patent.

British Gas, of course, disputes Miller Pipeline's proposed claim construction, referring the Court to the prosecution history of the '565 and '211 patents. British Gas contends that the words "intense local pressure" were never meant to be considered alone, particularly as it was undisputed that the Lindsay '302 patent, the prior art, contained the words "intense local pressure." Rather, British Gas argues

that in the prosecution of the '565 and '211 patents, the patent examiner was concerned that the claims specify that the intense local pressure was of a kind that would cause the pipe to fracture into irregular fragments and cause the fragments to spread outward about the axis of the pipe, as distinct from the type of intense local pressure that would cut the pipe into halves, citing to British Gas' own statements as applicant (*see* Plaint. Exh. 8, '565 patent, Paper No. 8 at 15–16, quoted in discussion above) and the patent examiner's statements in allowing the amended claims. The patent examiner stated, "... the claims are considered to be patentable over the reference to Lindsay in that Applicants' fracturing means are claimed as being 'operable to cause at least some outward movement of the fragments under the action of said intense local pressure which causes the fracturing of the main into irregular fragments.' This distinction was pointed out by Applicants' attorney, Mr. Petry, during the interview of June 25, 1987." Def. Statement of Material Facts, Def. Prior Summ. Judg.Mot. ("SMF") ¶ 26, quoting prosecution history, A/573. Earlier in the prosecution history, in the portion of the Examiner Interview Summary Record entitled "Description of the general nature of what was agreed to ...", the Examiner stated: "The claims to be amended to include the pipe broken by intense local pressure into irregular pieces; the pieces are spread generally about the axis; and the breaking and spreading takes place at the same location axially and at the same time." SMF ¶ 19, quoting prosecution history, A/429.

We find that British Gas' argument is supported reasonably by the language of the claims themselves and the prosecution history, including the remarks of the patent examiner, and that Miller Pipeline has not produced sufficient evidence supporting its proposed claim construction and non-infringement arguments to create a genuine issue of material fact that British Gas' claims were objectively baseless.

While the language of the prosecution history may be susceptible to the interpretation urged by Miller Pipeline, it is by no means clear that it is the only possible, reasonable interpretation or that British Gas' proposed interpretation is completely without support in the language of the claims and the prosecution history, nor has Miller Pipeline even created a genuine issue of material fact on this issue. The thrust of Miller Pipeline's argument appears to be that, because its devices are based upon the Lindsay '302 patented device, there is no way its devices can infringe the '565 patent. However, we note that Miller Pipeline does not dispute that it has made modifications to the Lindsay '302 patented design in its devices. We recognize that the Lindsay '302 patent in fact utilizes some kind of cutting wheels to apply pressure, and that Miller Pipeline's device appears to use a similar mechanism, but the importance of the cutting wheels themselves is unclear, and Miller Pipeline has not explained or supported its relevance adequately. In fact, British Gas points out certain differences between the Lindsay device's cutting wheels and the cutting wheels used in Miller Pipeline's device, for example, the fact that "Lindsay's pipe cutter (part 18) has twenty longitudinally spaced cutter discs (part 46) all in a single plane (See Figs. 9 and 10 of '302). In contrast, Miller's accused 1994 device uses a frame with three wings and mounts three or four disc-shaped blades per wing. Miller also uses three triangular fin-like blades which are not shown by Lindsay '302." Def. Prior Summ. Judg.Mot.Br. at 40.

The essence of Miller Pipeline's entire non-infringement theory appears to involve whether the Lindsay '302 patent covers fracturing crackable pipe into irregular pieces, rather than just cutting nonmalleable pipe into two halves, as British Gas contends. The only evidence that Miller

Pipeline produces in support of its theory is the affidavit of Dr. Bowles, discussed above, while British Gas, points to the language of the Lindsay '302 patent claims, which describe a "pipe splitter and spreader" and inventions for "a mechanism for replacing existing pipes with new pipes, the mechanism including means for slitting and spreading the existing pipe and then pulling a new pipe through the spread apart halves of the existing pipe, whereby the new pipe occupies the position of the existing pipe." Plaint. Exh. 10, '302 patent col. 1, lines 23–28; *see also* col. 1, lines 29–39; lines 52–60; col. 1, lines 70–72 through col. 2, lines 1–5 (describing similar mechanisms). This claim language of the '302 patent clearly describes slitting or cutting an existing pipe in half, rather than breaking the pipe into irregular fragments. While Dr. Bowles' affidavit may be enough to create a genuine issue of material fact as to the teachings of the Lindsay patented device,[6] it is not adequate alone to support reasonably the conclusion that British Gas' claims are objectively baseless.

After thoroughly reviewing the evidence in the record and the parties' arguments with respect to British Gas' infringement claims presented in the motion currently before the Court as well as British Gas' prior summary judgment motion, we cannot conclude that British Gas' claims are objectively baseless. On the contrary, it appears that there is a genuine dispute between the parties as to the proper claim construction of British Gas' patents, as well as the teachings and limitations of the Lindsay '302 patent and the relation of Miller Pipeline's devices to the Lindsay '302 patent and British Gas' patents. In addition, we find that Miller Pipeline has failed to meet its heavy burden to overcome the presumption that patent infringement claims are brought in good

---

**6.** We do not need to decide whether Dr. Bowles' affidavit in fact creates a genuine issue of material fact about the teachings of the Lindsay '302 patent because it is not necessary to determination of the motion present-

ly before the Court. However, we note that British Gas challenges Dr. Bowles' affidavit on many grounds, including inadmissible hearsay.

faith and create a genuine issue of material fact that British Gas' claims were objectively baseless. Miller Pipeline's arguments are aimed at the ultimate question of infringement and it repeatedly argues that its position is correct and that "[t]here is no way for the claims of the '565 patent to be broad enough to cover the Miller devices and not be invalid due to prior art." Plaint. Resp.Br. at 20. However, this is mere attorney argument, and Miller Pipeline does not present sufficient evidence or legal argument to support a jury determination that Miller Pipeline's interpretation is the only reasonable one or that no reasonable person would take the position British Gas has adopted, and we find such a conclusion unlikely from our review of the legal arguments and evidence in this case. This is a relatively complicated patent infringement case with sophisticated legal and factual arguments. Although there may seem to be only a subtle difference between arguing that one's position is correct and presenting support for the argument that one's position is the only possible, objective, definitive result, this distinction is critical in the determination of whether a claim is objectively baseless. We acknowledge that objective baselessness is very difficult to prove, for a litigant's reasonable belief in its chance to achieve success on the merits is quite a low threshold.

While we do not need to decide at this point whether British Gas ultimately will prevail on its infringement claims (and success or failure on the merits is not determinative of the issue of objective baselessness in any event, *see PREI*, 508 U.S. at 65, 113 S.Ct. at 1930–1931), we find that Miller Pipeline's antitrust claim cannot survive because our independent review of the record reveals that British Gas' claims were not objectively baseless and further, because Miller Pipeline has not directed our attention to sufficiently compelling evidence or legal precedent from which a reasonable jury could conclude that British Gas' infringement claims were objectively baseless and asserted by British Gas without any reasonable belief in success on the merits. Because Miller Pipeline did not satisfy its admittedly steep burden as to the objective prong of the sham litigation test and we find that British Gas' claims were not objectively baseless, we do not need to examine British Gas' subjective motive in threatening to sue Miller Pipeline for infringement and filing its counterclaim and the other litigation-related activities about which Miller Pipeline complains.[7] Accordingly, we *grant* British Gas' motion for partial summary judgment as to Miller Pipeline's claim under § 2 of the Sherman Act.

## CONCLUSION

Defendant moves for partial summary judgment on Plaintiff's claim that Defendant enforced its patents against Plaintiff in an anticompetitive manner in violation of § 2 of the Sherman Act. Defendant argues that it is immune from antitrust liability for asserting and enforcing its patents because it had at least a reasonable belief that Plaintiff was infringing its patents. Plaintiff responds that Defendant is not entitled to immunity because Defendant committed fraud on the patent office

---

7. Miller Pipeline relies upon *Kobe*, 198 F.2d at 425, for the proposition that British Gas' activities, taken as a whole, support a finding of anticompetitive conduct. We note that the Tenth Circuit in *Kobe* did find that the patentholder's infringement lawsuit and related activities were unlawful because they were intended and designed to further and give effect to an overall monopolistic scheme. However, the court expressly stated, "The infringement action and the related activities, of course, in themselves were not unlawful, and standing alone would not be sufficient to sustain a claim for damages which they may have caused...." 198 F.2d at 425. The *Kobe* court found such activities illegal only in combination with the rest of the patentholder's anticompetitive scheme. Here, Miller Pipeline only complains about British Gas' activities related to its infringement notices and threats to bring suit and other litigation-related activities and does not identify any broader monopolistic scheme of which these activities constitute only a part. Thus, we find that *Kobe* does not speak to this case.

in the procurement of its patents and asserted its patents against Plaintiff in bad faith. Plaintiff also argues that Defendant's infringement claims were objectively baseless. For the reasons discussed in the Court's opinion above, we find that (1) there is insufficient evidence to support the claim of fraud on the patent office; (2) British Gas' patent enforcement activities, including pre-litigation infringement notices and threats to sue, are subject to the *Noerr–Pennington* "sham litigation" doctrine and (3) British Gas' infringement claims were not objectively baseless. Accordingly, we hold that British Gas is entitled to antitrust immunity under the *Noerr–Pennington* doctrine and *grant* British Gas' motion for partial summary judgment on Miller Pipeline's claim under § 2 of the Sherman Act.